UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

ANNE TROVATO,
              Petitioner,

v.

SABRINA KAPLAN, Superintendent,
Bedford Hills Correctional Facility,
              Respondent.

------------------------------------------------------------x

**MEMORANDUM DECISION**

11 CV 6092 (VB)



Copies Mailed/Faxed _____
Chambers of Vincent L. Briccetti

Briccetti, J.:

      Now pending before the Court is Magistrate Judge George A. Yanthis's Report and Recommendation ("R&R"), dated December 19, 2012 (Doc. #24), on petitioner pro se Anne Trovato's petition for a writ of habeas corpus.

      Petitioner was convicted in Supreme Court, Westchester County, of murder in the second degree and burglary in the second degree, in the death of her mother. Her conviction was affirmed by the Appellate Division, Second Department, and her motion seeking leave to appeal was denied by the Court of Appeals on March 30, 2010. She filed the instant petition on August 23, 2011. Chief Judge Preska issued an order directing petitioner to show cause by affirmation why her petition should not be dismissed as time barred. Petitioner filed an affirmation, and respondent thereafter moved to dismiss the petition as untimely filed. Judge Yanthis recommended that this Court grant respondent's motion. (Doc. #16).

      For the reasons set forth below, the Court adopts the R&R as the opinion of the Court, and GRANTS the motion to dismiss. The petition is dismissed in its entirety.

Standard of Review

      In reviewing a magistrate judge's recommended ruling, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate

1

judge." 28 U.S.C. § 636(b)(1)(C).  Parties may raise objections to the recommended ruling, but they must be "specific" and "written," and submitted "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); see also 28 U.S.C. § 636(b)(1)(C).  When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a de novo standard of review.  28 U.S.C. § 636(b)(1)(C); see Fed. R. Civ. P. 72(b)(3) ("The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.").  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  See Wilds v. UPS, Inc., 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).  The clearly erroneous standard also applies when a party makes only conclusory or general objections, or simply reiterates her original arguments.  Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008).

The objections of parties appearing pro se are "generally accorded leniency," Milano v. Astrue, 2008 WL 4410131, at *2 (S.D.N.Y. Sept. 26, 2008),[1] and should be construed to "raise the strongest arguments that they suggest." Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006). "Nonetheless, even a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a 'second bite at the apple' by simply relitigating a prior argument." Pinkney v. Progressive Home Health Servs., 2008 WL 2811816, at *1 (S.D.N.Y. July 21, 2008).

---

[1] Plaintiff will be provided with copies of all unpublished opinions cited in this ruling.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Discussion

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), petitioner is entitled to habeas corpus relief only if she can show "the state court 'unreasonably' applied law as established by the Supreme Court in ruling on petitioner's claim, or made a decision that was 'contrary to' it." Cousin v. Bennett, 511 F.3d 334, 337 (2d Cir. 2008) (quoting 28 U.S.C. § 2254(d)(1)). The state court's determination of factual issues is presumed correct, and petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A petition for a writ of habeas corpus must be filed within one year of the latest of four triggering events. In this case, the triggering event was the "date on which [petitioner's state court] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Petitioner's judgment became final on June 28, 2010, ninety days after the New York Court of Appeals denied her motion for leave to appeal, which was the deadline for seeking a writ of certiorari from the United States Supreme Court. Ross v. Artuz, 150 F.3d 97, 98 (2d Cir. 1998). Thus, the one year statute of limitation expired June 28, 2011. Since the instant petition was filed on August 23, 2011, it was untimely under 28 U.S.C. § 2244(d)(1)(A). And since petitioner did not file an application in State court for post-conviction relief or other collateral review, the one year statute in this case was not tolled. See 28 U.S.C. § 2244(d)(2).

The central question addressed by Magistrate Judge Yanthis was whether petitioner was nonetheless entitled to equitable tolling of the AEDPA limitation period. For equitable tolling to apply, petitioner must show that she diligently pursued her rights and that "some extraordinary circumstance . . . prevented timely filing." Holland v. Florida, 130 S. Ct. 2549, 2562 (2010).

Petitioner argues she is entitled to equitable tolling because she was misinformed by a prison law library clerk that she was required to file a motion for post-conviction relief under N.Y. C.P.L. § 440.10 prior to filing her federal habeas petition; she diligently pursued her rights by requesting her trial transcripts numerous times in order to prepare her CPL 440.10 motion; her inability to obtain her trial transcripts caused undue hardship and impeded her ability to file an appeal; and she is actually innocent of the charges for which was convicted.

In the R&R, Judge Yanthis rejected petitioner's arguments because (1) misinformation provided by a prison law clerk is not an extraordinary circumstance preventing timely filing of the petition, (2) petitioner has not alleged that her inability to obtain the trial transcripts, even if she acted diligently in attempting to obtain them, somehow prevented her from filing the habeas petition on time, and (3) she proffered no new reliable evidence in light of which it is likely no reasonable juror would have found her guilty beyond a reasonable doubt. Accordingly, Judge Yanthis found that petitioner is not entitled to equitable tolling of the one year statute of limitation, and recommended that the motion to dismiss be granted and that the petition be dismissed in its entirety.

On January 7, 2013, petitioner filed timely objections to the R&R, entitled "Petitioner's Opposition to the United States District Court's Order and Recommendation to Dismiss." (Doc. #27). However, the objections merely reiterate the arguments petitioner made to Judge Yanthis in opposition to respondent's motion to dismiss.[2]

Having reviewed the petition, petitioner's affirmation for timeliness, respondent's motion to dismiss, petitioner's response to the motion, and petitioner's objections to the R&R, as well all

---

[2] The Court has reviewed documents petitioner has submitted with her objections, which she refers to as "new evidence." These documents do not alter the Court's conclusion that petitioner is not entitled to equitable tolling and that she has not proffered new reliable evidence of actual innocence.

other papers submitted in this case, the Court concludes that Judge Yanthis's thorough and well-reasoned R&R is not clearly erroneous.  Moreover, the R&R correctly found that petitioner was not entitled to equitable tolling.

## CONCLUSION

Judge Yanthis's R&R is hereby adopted in its entirety as the opinion of the Court.  The motion to dismiss the petition for a writ of habeas corpus is GRANTED, and the petition is DISMISSED as time-barred.  The Clerk is instructed to enter judgment accordingly and close this case.

The Clerk is also instructed to terminate the motion.  (Doc. #16).

As petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  See 28 U.S.C. § 2253(c)(2); Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005).  The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal.  See Coppedge v United States, 369 U.S. 438, 444-45 (1962).

Dated: February 11, 2013
      White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge

2008 WL 2811816
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Kathy PINKNEY, Plaintiff,

v.

PROGRESSIVE HOME HEALTH
SERVICES; Local 1199, Service Employers
International Union, AFL-CIO, Defendants.

No. 06 Civ. 5023(LTS)(JCF).   |   July 21, 2008.

Opinion

**MEMORANDUM OPINION AND ORDER
ADOPTING REPORT AND RECOMMENDATION**

LAURA TAYLOR SWAIN, District Judge.

**\*1** On November 28, 2006, Magistrate Judge James C. Francis IV issued a Report and Recommendation ("Report") recommending that summary judgment be granted in favor of Defendant Local 1199 of the Service Employees International Union ("1199/SEIU"), and that the motion of Defendant Progressive Home Health Services ("Progressive") to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) be granted. Timely objections to the Report were received from Plaintiff, and Defendants 1199/SEIU and Progressive have submitted affirmations in response to Plaintiffs objections.

When reviewing a Report and Recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C.A. § 636(b)(1)(C) (West Supp.2006). The court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). To the extent, however, that the party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the Report strictly for clear error. *See Pearson-Fraser v. Bell AtL,* No. 01 Civ. 2343(WK), 2003 WL 43367, at \*1 (S.D.N.Y. Jan. 6, 2003); *Camardo v. Gen. Motors Hourly-Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992); *Vargas v. Keane,* No. 93 Civ. 7852(MBM), 1994 WL 693885 at \*1 (S.D.N.Y. Dec. 12, 1994). *Pro se* parties are generally accorded leniency

when making objections. *Walker v. Vaughn,* 216 F.Supp.2d 290, 292 (S.D.N.Y.2002) (quoting *Vasquez v. Reynolds,* No. 00 Civ. 0862, 2002 WL 417183 at \*5 (S.D .N.Y. Mar. 18, 2002)). Nonetheless, even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a "second bite at the apple" by simply relitigating a prior argument. *Camardo,* 806 F.Supp. at 381-82.

The Court has conducted a thorough review of the record herein, including, among other things, the parties' submissions, the Report, Plaintiff's extensive objections, and the relevant legal authority. Plaintiff's objections are an effort to reiterate her earlier arguments and the relevant portions of her objections are presented in a conclusory fashion, simply reflecting her disagreement with Judge Francis's conclusions. Since Plaintiff raises only general or conclusory objections, the Court reviews the Report for clear error.

The Court has reviewed Judge Francis's thorough and well-reasoned Report and finds no clear error. The Court adopts the Report in its entirety for the reasons stated therein.

*CONCLUSION*

Judge Francis's Report and Recommendation is hereby adopted in its entirety. Defendant 1199/SEIU's motion for summary judgment is granted, as is Defendant Progressive Home Health Services's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Clerk of Court is respectfully requested to enter judgment accordingly and close this case. This Memorandum Opinion and Order resolves docket entry nos. 4, 7, and 29.

**\*2** SO ORDERED.

*REPORT AND RECOMMENDATION*

JAMES C. FRANCIS IV, United States Magistrate Judge.

TO THE HONORABLE LAURA T. SWAIN, U.S.D.J:
Kathy Pinkney brings this action *pro se* against her former employer, Progressive Home Health Services ("Progressive"), and Local 1199 of the Service Employees International Union, CTW, CLC [1] ("1199/SEIU" or the "Union"), which represents Progressive employees. She

alleges that she was discharged without just cause in violation of the Collective Bargaining Agreement ("the Agreement") between Progressive and 1199/SEIU, and that the Union breached its duty of fair representation by failing to take her grievance to arbitration. Defendant Progressive has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendant 1199/SEIU has filed a hybrid motion to dismiss pursuant to Rule 12(b)(6) and for summary judgment pursuant to Rule 56. For the reasons outlined below, I recommend that the complaint be dismissed with respect to Progressive and that summary judgment be granted in favor of 1199/SEIU.

1   This defendant is incorrectly identified in the caption as Service Employers International Union, AFL-CIO. Two additional defendants, Elliott Greene and Dennis Rivera, were named in the original complaint. The plaintiff has requested that these individual defendants be removed from the case. (Letter of Kathy Pinkney dated July 20, 2006).

### Background

Ms. Pinkney began working as a Home Health Aide at Progressive on December 10, 2004. (Letter of Jackie Harootian dated Aug. 22, 2005 ("Harootian 8/22/05 Letter"), attached to Opposing Motion Affidavit or Affirmation of Kathy Pinkney dated July 12, 2006 ("Pl.Aff."); Ninety Day Probationary Period Evaluation, attached to Pl. Aff.). On July 20, 2005, she was at a patient's apartment when she became disturbed by the patient's behavior. (Amended Complaint [2] at 3) According to Ms. Pinkney, the patient had put a carving knife and fork under her pillow, made violent threats against the patient's sister, and complained about the care she had received from Ms. Pinkney. (Amended Complaint at 3; Pl. Aff., ¶¶ 18, 19). Ms. Pinkney called her supervisor and asked for another assignment. (Amended Complaint at 3). After speaking with the patient's sister, the supervisor asked Ms. Pinkney to keep working with the patient, and Ms. Pinkney agreed. (Amended Complaint at 3; Issue Form dated July 21, 2005, attached to Pl. Aff.; Pl. Aff., ¶ 19).

2   "Amended Complaint" refers to a document by that title which was filed by the plaintiff after 1199/SEIU filed its hybrid motion to dismiss and for summary judgment. "Complaint" refers to the plaintiff's original pleading.

After leaving work, however, the plaintiff reconsidered and decided that she did not feel safe returning to the patient's home. (Amended Complaint at 3). In the morning, she called Progressive and again requested another assignment. [3]

(Amended Complaint at 3). A meeting was scheduled with the coordinator for Monday, July 25, 2005 to discuss the issue. (Amended Complaint at 3; D/CAF at 1). Ms. Pinkney did not return to work in the meantime. (Harootian 8/22/05 Letter).

3   The Disciplinary/Corrective Action Form dated July 29, 2005 ("D/CAF", attached to Pl. Aff.) submitted by the plaintiff states that Ms. Pinkney also called the patient and her sister to inform them that her "spirit will not allow her to enter the apartment." (D/CAF at 2).

The plaintiff was unable to attend the July 25 meeting, which was rescheduled for the following day, which was Tuesday, July 26, 2005. (Amended Complaint at 3; D/CAF at 1). The plaintiff called again the following day to cancel the meeting. (D/CAF at 2). The plaintiff's submissions regarding this series of events are somewhat contradictory. According to the Amended Complaint, she called Progressive on Tuesday, July 26 to say that she was again unable to attend the meeting and was told to come in on Friday. (Amended Complaint at 3). When she called on Friday, she was The form states that Ms. Pinkney "was inappropriate for telling any client or patient or their family this information." (D/CAF at 2). informed that she had been terminated. [4] (Amended Complaint at 3). However, according to several other documents submitted by the plaintiff, she was told on July 26 that she should come in the following day but failed to do so. (D/CAF at 2-3; Letter of Eleanor Halley dated Jan. 30, 2006 ("Halley 1/30/06 Letter"), attached to Pl. Aff.). According to these documents, Ms. Pinkney made no further effort to contact her employer until after she was terminated on July 29, 2005. (D/CAF at 3-4; Halley 1/30/06 Letter).

4   According to the original Complaint, Ms. Pinkney called the office on Tuesday, July 26, and told Nancy Dixon, a Progressive Team Leader, that she would come in on Thursday morning. (Complaint, ¶ 5). Ms. Dixon then called her on Wednesday to tell her not to come in on Thursday, and that Ms. Dixon would call her on Friday. (Complaint, ¶ 6). On Friday, Ms. Dixon and another Progressive employee, Brenda Robinson, called Ms. Pinkney to tell her that she had been terminated. (Complaint, ¶ 6; Amended Complaint at 3).

**\*3**  On Friday, July 29, 2005, Ms. Pinkney was informed by telephone that she had been terminated. (Amended Complaint at 3; D/CAF at 1; Halley 1/30/06 Letter). According to Progressive, the plaintiff was terminated for potentially endangering a patient by refusing to enter the patient's apartment despite having told her supervisor the previous day

that she would attend to the case, and for repeatedly cancelling meetings to discuss the incident. (Halley 1/30/06 Letter).

On August 1, 2005, Ms. Pinkney called Benicia Williams, who is the 1199/SEIU Member Organizer for Progressive employees. (Complaint, ¶ 7). Ms. Williams said that she would call Progressive to find out what had happened, but when the plaintiff spoke with her four days later, Ms. Williams said that Ms. Dixon was on vacation, and that she would call Ms. Pinkney back. (Complaint, ¶ 7). According to Ms. Pinkney, Ms. Williams failed to return her calls on several subsequent occasions, and Ms. Pinkney did not hear from the Union again regarding her termination until September. (Amended Complaint at 4; Complaint, ¶ 7; Declaration of Benicia Williams in Support of Union Defendants' Hybrid Motion ("Williams Decl."), ¶ 10). At some point in September, she received a letter dated a month earlier stating that the Union intended to grieve her termination. (Amended Complaint at 4).

A grievance meeting was held on September 27, 2005. (Williams Decl., ¶ 12). The meeting included Ms. Williams, Ms. Dixon, Ms. Robinson, and Ms. Pinkney. (Williams Decl., ¶ 12; Complaint, ¶ 8). Although Ms. Williams sought reinstatement for the plaintiff, Progressive rejected this request. (Williams Decl., ¶ 13; Complaint, ¶ 11).

A second step grievance meeting was held on December 16, 2005, at which Progressive again refused to reinstate the plaintiff. (Williams Decl., ¶ 14). A third step grievance meeting was held on January 30, 2006. (Williams Decl., ¶ 15). This meeting was attended by Ms. Pinkney, Ms. Williams, and Ms. Williams' supervisor, as well as by Eleanor Halley, a representative of Progressive. (Williams Decl., ¶ 15). After this third step meeting, Ms. Halley sent a letter to the Union stating that Ms. Pinkney would not be reinstated. (Halley 1/30/06 Letter). At this point, Ms. Williams informed Ms. Pinkney that the Union would not proceed to arbitration because it did not believe it was likely to succeed given the relatively short period of time Ms. Pinkney had worked for Progressive and the "substantial evidence" supporting Progressive's position. (Williams Decl., ¶ 17).

Ms. Williams informed the plaintiff that, under the 1199/SEIU Constitution, she could appeal the Union's decision to the Home Care Chapter Hearing and Appeals Board. (Williams Decl., ¶ 17; 1199/SEIU Constitution ("Constitution"), attached to Williams Decl., Art. IX, § 6(b)). The Chapter Hearing and Appeals Board is made up

of Union delegates employed by Progressive. (Constitution, Art. IX; Williams Decl., ¶ 18). Ms. Pinkney presented her case to the Chapter Hearing and Appeals Board on February 9, 2006. (Williams Decl., ¶ 20; Letter of Benicia Williams dated Feb. 3, 2006, attached to Pl. Aff.). On February 14, 2006, the Chapter Hearing and Appeals Board denied Ms. Pinkney's request that her termination be taken to arbitration and informed her that she could appeal the decision by making a request in writing to Executive Vice President Aida Garcia within fifteen days. (Letter of Agnes Botas, Ralph Morgan, and Veda Thomas dated Feb. 14, 2006, attached to Pl. Aff.).

**\*4** The plaintiff wrote to Ms. Garcia on February 17, 2006, requesting another hearing and threatening legal action against the Union. (Letter of Kathy Pinkney dated Feb. 17, 2006, attached to Pl. Aff.). Ms. Pinkney appeared before the Home Care Division Wide Hearing and Appeals Board on March 8, 2006. (Williams Decl., ¶ 22; Letter of Benicia Williams dated March 8, 2006, attached to Pl. Aff.). On March 10, 2006, Ms. Williams informed the plaintiff in writing that the Division Wide Hearing and Appeals Board had voted not to take her case to arbitration. (Letter of Benicia Williams dated March 10, 2006 ("Williams 3/10/06 Letter"), attached to Pl. Aff.). Under the 1199/SEIU Constitution, the decision of the Division Wide Hearing and Appeals Board is final, and the Union informed Ms. Pinkney that it considered the matter closed. (Constitution, Art. IX, § 6(c); Williams 3/10/06 Letter).

The plaintiff filed a complaint in New York State Supreme Court on June 12, 2006. (Complaint, attached as Exh. A to Notice of Petition for Removal of State Court Action dated June 28, 2006). The case was removed to the Southern District of New York. 1199/SEIU then filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Progressive filed a motion to dismiss pursuant to Rules 12(b)(1), (5), and (6). Along with her opposition to these motions to dismiss, the plaintiff included numerous documents as exhibits that had not been included with the original complaint. In response, 1199/SEIU informed the court that it would treat the plaintiff's opposition papers as an Amended Complaint and would file a hybrid motion to dismiss and motion for summary judgment. (Letter of Allyson L. Belovin dated July 19, 2006). On August 31, 2006, after that motion had been filed, the plaintiff filed a document entitled "Amended Complaint," which I have considered along with the plaintiff's other submissions.

*Discussion*

## A. *Legal Standard*

Ms. Pinkney asserts a claim against Progressive for breach of the Agreement pursuant to § 301 of the Labor Management Relations Act (the "Act"). She asserts a claim against Local 1199 for breach of the duty of fair representation, a duty arising out of the Act. [5] "Although the two causes of action are distinct, courts have combined them to create one claim known as the hybrid § 301/duty of fair representation claim ('hybrid § 301/DFR')." *Scott v. New York Health and Human Services Union, 1199/SEIU, AFL-CIO,* No. 00 Civ. 9381, 2003 WL 359534, at *5 (S.D.N.Y. Feb. 6, 2003). In order to establish a hybrid § 301/DFR claim, the plaintiff must prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation. *Sanozky v. International Association of Machinists and Aerospace Workers,* 415 F.3d 279, 282 (2d Cir.2005) (citing *DelCostello v. International Brotherhood of Teamsters et al.,* 462 U.S. 151, 164-65 (1983)); *accord White v. White Rose Food,* 237 F.3d 174, 178 (2d Cir.2001); *Scott,* 2003 WL 359534, at *5.

[5]  Because unions have statutory authority to act as the exclusive representatives of all members, courts have implied a statutory obligation on the part of each union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177 (1967)).

*5  Because the Agreement contains a grievance procedure culminating in arbitration,

> someone in [the] plaintiff's position cannot simply sue her employer in a court of law for violating [the Agreement], but must first attempt to exhaust the remedies provided by that agreement. Ordinarily, that would end the matter, since such a plaintiff would either win in the arbitration or if she lost ... would be bound by the result in that forum. However, ... if [the] plaintiff can show that the failure to arbitrate or the unsuccessful result in that forum was due to ... a breach of [the Union's] duty to represent [the] plaintiff fairly, then the judicial forum will still be open.

*Young v. United States Postal Service,* 907 F.2d 305, 307 (2d Cir.1990) (internal citations omitted). Accordingly, "the Union's breach is a prerequisite to consideration of the merits of plaintiff's claim against her former employer for improper discharge ." *Young,* 907 F.2d at 307; *accord Flanigan v. (International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America) Truck Drivers Local No. 671,* 942 F.2d 824, 828-29 (2d Cir.1991) (citing *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 62 (1981)); *Vargas v. Service Employees International Union Local Union No. 32B-32J,* No. 05 Civ. 9992, 2006 WL 3019565, at *4 (S.D.N.Y. Oct. 23, 2006).

## B. *Breach of the Duty of Fair Representation*

As noted above, in addition to moving to dismiss the complaint pursuant to Rule 12(b)(6), the Union has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 285-86 (2d Cir.2002); *Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co.,* 189 F.3d 208, 214 (2d Cir.1999). The moving party bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). It is the moving party's burden to show that no genuine factual dispute exists, and all reasonable inferences must be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003).

To rise to the level of a breach of the duty of fair representation, the union's conduct toward a member of the bargaining unit must be "arbitrary, discriminatory, or in bad faith ." *Scott,* 2003 WL 359534, at *5; *see also White,* 237 F.3d at 179. Therefore, "in order to survive a summary judgment motion, the plaintiff ... must set forth concrete, specific facts from which one can infer a union's hostility, discrimination, bad faith, dishonesty, or arbitrary exercise of discretion." *Lapir v. Maimonides Medical Center,* 750 F.Supp. 1171, 1177 (E.D.N.Y.1990) (citing *Spielman v. Anchor Motor Freight, Inc.,* 551 F.Supp. 817, 822

(S.D.N.Y.1982)). Furthermore, the union's conduct must be a direct cause of the plaintiff's injuries. *See White,* 237 F.3d at 179; *Sim v. New York Mailers' Union No. 6,* 166 F.3d 465, 472 (2d Cir.1999) (citing *Spellacy v. Airline Pilots AssociationInternational,* 156 F.3d 120, 126 (2d Cir.1998)).

**\*6** The plaintiff s primary allegation is that the Union failed to follow through on her case and pursue arbitration. (Amended Complaint at 4). Although a union need not pursue a grievance that it believes to be without merit, *Scott,* 2003 WL 359534, at *6, a union may not "arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." *Vaca,* 386 U.S. at 191. In this case, the Union's decision not to pursue arbitration was based on its belief that arbitration would be futile, given that Ms. Pinkney had been employed by Progressive for less than a year and that the employer's complaint against her was well-founded. The plaintiff's complaint appears to be based on the misguided notion that the Union has a duty to take every grievance to arbitration. However, "[i]t is well-established that where, as here, the union has made an informed decision that a grievance is not meritorious, [the] plaintiff has no right to arbitration. 'A union has wide discretion to determine in good faith when pursuit of an individual's grievance would be fruitless.' " *Lapir,* 750 F.Supp. at 1179 (internal citations omitted) (quoting *Tolentino v. Erickson,* 525 F.Supp. 812, 816 (E.D.N.Y.1981)).

The plaintiff alleges that the Union was biased against her, either because she "fought for [her] rights to be heard" or because of her religion.[6] (Pl. Aff. ¶¶ 16, 19; Complaint, ¶ 13). Although she claims that the defendants made "biased remarks," Ms. Pinkney does not describe these remarks or any other facts that might support her claim that the Union discriminated against her. There is no evidence in the record indicating that the Union's failure to pursue Ms. Pinkney's grievance was based upon anything other than a reasoned determination that arbitration was unlikely to be successful.

[6]   Ms. Pinkney asserts that "her spirit told her not to" enter the apartment of the patient for whom she was responsible. (Pl.Aff., ¶ 19). The plaintiff appears to contend that her refusal to enter the patient's home was based on a religious belief, and that her subsequent termination therefore constituted religious discrimination.

Furthermore, the plaintiff's grievance was not processed in a perfunctory fashion. The plaintiff repeatedly states that Ms. Williams and her supervisor, Keith Joseph, either failed to respond or responded to her phone calls and written inquiries in an untimely fashion. (Pl. Aff., ¶¶ 3, 18; Amended Complaint at 4; Complaint, ¶ 12). However, she does not allege that any resulting delay in the processing of her grievance prejudiced her in any way. The Union sought reinstatement for Ms. Pinkney through all three steps of the grievance process, and Ms. Pinkney's appeal of the Union's decision was heard by two different Hearing and Appeals Boards, which are comprised of union members rather than union staff.

When considering a claim of breach of the duty of fair representation, "the Court's review of [the Union's] actions must be highly deferential and take into account the wide latitude the Union needs to be effective as a bargaining agent for its members." *Scott,* 2003 WL 359534, at *6. In this case, no reasonable trier of fact could find, based on the evidence before the Court, that the Union's actions were outside the " 'wide range of reasonableness' " afforded to unions in representing their members. *Id.* (quoting *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 45 (1998)). Summary judgment should therefore be granted in favor of 1199/ SEIU. Because a breach of the duty of fair representation is a threshold requirement for maintaining a cause of action against the employer under § 301, defendant Progressive's motion to dismiss should also be granted.

### Conclusion

**\*7** For the reasons stated above, summary judgment should be granted in favor of defendant 1199/SEIU, and defendant Progressive's motion to dismiss should be granted. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Laura T. Swain, U.S.D.J., Room 755, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

End of Document

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4410131
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Anthony J. MILANO, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 05 Civ. 6527(KMW)(DCF).   |   Sept. 26, 2008.

Opinion


## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

**\*1** *Pro se* Plaintiff Anthony Milano ("Plaintiff") brings this employment discrimination action against Michael J. Astrue, the Commissioner of Social Security ("Defendant").[1] Plaintiff claims that the Social Security Administration ("SSA") discriminated against him on the basis of age and retaliated against him for seeking redress with the Equal Employment Opportunity Commission.

[1]     The Amended Complaint in this action named Joanne B. Barnhart, the previous Commissioner of Social Security, as the defendant. (D.E. 19.) Michael J. Astrue, the current Commissioner of Social Security, was automatically substituted as the defendant in this action. See Fed.R.Civ.P. 25(d).

Under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634, Plaintiff alleges discrimination and retaliation related to (1) the SSA's failure to promote Plaintiff on twenty occasions over a nine-year period; (2) the extension of a colleague's temporary assignment; and (3) Plaintiff's reassignment from a team leader to a program expert (collectively, the "ADEA claims"). In addition, Plaintiff claims that the SSA violated (4) the Privacy Act of 1974, 5 U.S.C. § 552a (the "Privacy Act claim"); and (5) the Civil Service Reform Act, 5 U.S.C. §§ 2301(b), 2302(b) (the "CSRA claim").

Defendant moves for summary judgment seeking to dismiss Plaintiff's complaint in its entirety. Plaintiff cross-moves for summary judgment.

## I. Background

The factual background and procedural history of this action are set forth in full in Magistrate Judge Freeman's Report and Recommendation dated August 18, 2008 (the "Report"), familiarity with which is assumed. (*See* Report 1–41, D.E. 64.) The Report recommends that the Court grant Defendant's motion for summary judgment in its entirety and deny Plaintiff's cross-motion for summary judgment in its entirety. (*See id.* at 2, 80.)

Plaintiff submitted timely objections to the Report. Defendant submitted a timely response to Plaintiff's objections. After review of the record, the Report, Plaintiff's objections, and Defendant's response, the Court (1) adopts the Report in its entirety, (2) grants Defendant's motion for summary judgment in its entirety, and (3) denies Plaintiff's cross-motion for summary judgment in its entirety.

## II. Standard of Review of a Magistrate Judge's Report and Recommendation

Where no timely written objections have been filed, the Court reviews a magistrate judge's report and recommendation for clear error. *See Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985); Fed.R.Civ.P. 72(b) advisory committee note. Similarly, where a party "makes only conclusory or general objections, or simply reiterates the original arguments," the Court reviews for clear error. *Dixon v. Ragland,* No. 03 Civ. 826, 2007 U.S. Dist. LEXIS 85159, at \*2–3 (S.D.N.Y. Nov. 16, 2007) (citations omitted); *see also Pilgrim v. Luther,* No. 01 Civ. 8995, 2007 U.S. Dist. LEXIS 7410, at \*7 (S.D.N.Y. Jan. 24, 2007) (citations omitted). However, where a party has filed timely written objections beyond those just described, the Court reviews a magistrate judge's report and recommendation *de novo. See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b)(3).

**\*2** Because Plaintiff proceeds *pro se,* his objections "are generally accorded leniency." *Dixon,* 2007 U.S. Dist. LEXIS 85159, at \*3 (citation omitted). Furthermore, the Court construes Plaintiff's objections to "raise the strongest arguments that they suggest." *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006) (citation omitted).

## III. Clear Error Review of the Privacy Act and CSRA Claims

The Report recommends dismissing the Privacy Act claim because "Plaintiff has failed to present evidence capable of

satisfying the elements of a Privacy Act violation." (Report 79.) The Report also recommends dismissing the CSRA claim because "the CSRA does not provide Plaintiff with a federal judicial remedy." (*Id.* at 80.) No party filed objections to these recommendations. Reviewing these recommendations for clear error, the Court finds the Report to be well-reasoned and free of any "clear error on the face of the record." Fed.R.Civ.P. 72(b) advisory committee note; *see also Nelson,* 618 F.Supp. at 1189. The Court therefore adopts the Report's recommendations to dismiss the Privacy Act and CSRA claims. Accordingly, the Court grants summary judgment in favor of Defendant with respect to the Privacy Act and CSRA claims.

**IV. *De Novo* Review of the ADEA Claims**

The Report recommends granting Defendant's motion for summary judgment with respect to the ADEA claims. First, the Report finds that one of Plaintiff's twenty failure to promote claims is time-barred. (*See* Report 49–52.) Second, the Report finds that "Plaintiff has failed to satisfy his burden of producing sufficient evidence to create an issue of fact as to pretext" with respect to all twenty failure to promote claims. (*Id.* at 70.) Third, the Report finds that Plaintiff "failed to create a genuine dispute of fact as to the SSA's purported reason for [his colleague's] extension." (*Id.* at 71–72.) Fourth, the Report finds that "Plaintiff has not presented sufficient evidence to demonstrate that the SSA's proffered reasons for his reassignment [from a team leader to a program expert] are pretextual and that discrimination or retaliation was the 'real reason' for his reassignment." (*Id.* at 78.)

Plaintiff objects to the Report's analysis and recommendations with respect to the ADEA claims. [2] Although Plaintiff's objections largely repeat the arguments raised in his summary judgment papers, the Court exercises its discretion and reviews the ADEA claims *de novo. See Thomas v. Arn,* 474 U.S. 140, 154 (1985).

[2]    Plaintiff's objections are largely based on conclusory and speculative assertions. The Court notes that "conclusory statements, conjecture, or speculation" do not create a genuine issue of material fact. *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

After *de novo* review of the record, the Report's analysis of the ADEA claims, Plaintiff's objections, and Defendant's response, the Court adopts Magistrate Judge Freeman's thorough and well-reasoned Report in its entirety. The Report thoroughly addresses most of Plaintiff's objections. The

Court finds that Plaintiff's remaining objections lack merit. Accordingly, the Court grants summary judgment in favor of Defendant with respect to the ADEA claims.

**V. Conclusion**

**\*3** For the reasons stated above, the Court adopts Magistrate Judge Freeman's thorough and well-reasoned Report in its entirety. Accordingly, the Court GRANTS Defendant's motion for summary judgment in its entirety (D.E.41), and DENIES Plaintiff's cross-motion for summary judgment in its entirety (D.E.55). The Clerk of Court is directed to close this case. Any pending motions are moot.

SO ORDERED.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge.

**TO THE HONORABLE KIMBA M. WOOD, U.S.D.J.:**

*INTRODUCTION*

In this employment discrimination case, *pro se* plaintiff Anthony Milano ("Plaintiff"), a Program Expert employed by the Social Security Administration ("SSA"), claims that the SSA discriminated against him on the basis of his age and retaliated against him for his Equal Employment Opportunity ("EEO") activity. Specifically, Plaintiff asserts that the SSA discriminated and retaliated against him when it failed to promote him 20 times, over a nine-year period, to available positions for which he was qualified; when it extended a colleague's "non-competitive detail" (a temporary assignment for which SSA employees were not able to compete in a selection process); and when it reassigned Plaintiff from his prior position as a Team Leader to his current position. Plaintiff brings his claims under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*

Additionally, Plaintiff claims that the SSA violated the Privacy Act of 1974 (the "Privacy Act"), 5 U.S.C. § 522a, when his supervisors told Plaintiffs co-worker that Plaintiff was being reassigned before informing him of the reassignment. Lastly, Plaintiff contends that the SSA's promotion plan is in violation of the Civil Service Reform Act ("CSRA"), 5 U.S.C. §§ 2301(b), 2302(b), because it allegedly

allows the SSA to disregard "merit principles" in the selection process.

Defendant Michael J. Astrue, the Commissioner of the SSA (together with the SSA), has filed a motion for summary judgment, which has been referred to me for a report and recommendation. In seeking to dismiss Plaintiff's complaint in its entirety, the SSA argues that: (1) Plaintiff failed to exhaust his administrative remedies with respect to the first incident in which he was allegedly denied a promotion for discriminatory reasons, in that he failed to raise that claim in a timely manner before the EEOC; (2) Plaintiff has not presented evidence capable of showing that the SSA's stated non-discriminatory and non-retaliatory reasons for selecting other individuals for available positions are pretextual; and (3) Plaintiff has failed to state a claim under the Privacy Act or the CSRA. Plaintiff has opposed the motion and cross-moved for summary judgment in his favor. For the reasons set forth herein, I respectfully recommend that summary judgment be granted in the SSA's favor on each of Plaintiff's claims and that Plaintiff's cross-motion be denied.

## BACKGROUND

### A. *Plaintiff's Education and Employment with the SSA*

*\*4* The material facts regarding Plaintiff's education and history of employment with the SSA are undisputed.[1] Plaintiff was born on February 3, 1941, and has been employed with the SSA since 1963. (Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, dated Oct. 17, 2007 ("Def. Rule 56.1 Stmt.") (Dkt.43), at ¶ 1; Declaration of Kristin L. Vassallo, dated Oct. 17, 2007 ("Vassallo Decl.") (Dkt.45), Ex. C (Transcript of deposition of Anthony Milano, conducted Mar. 21, 2006 and May 23, 2007 ("Milano Dep.")), at p. 8, l. 21, p. 22, ll. 4–5.) He obtained a Bachelor of Arts from Rutgers University in 1963 and completed 12 credits at Seton Hall School of Law. (*Id.,* at p. 16, ll. 7–9, 15–16.) Plaintiff worked for the SSA as a claims representative from 1963 until 1968. (*Id.,* at p. 26, l. 15.) In 1968, he was promoted to Field Representative, a GS–10 position[2] and held that position until 1970, when he applied for and was promoted to Operations Supervisor, a GS–11 position. (*Id.,* at p. 26, ll. 18–25, p. 28, ll. 17–21.) Plaintiff applied for and was promoted in 1973 to the GS–12 position of Branch Manager of the Field Office in Hoboken, New Jersey. (*Id.,* at p. 30, ll. 2–19.) In September 1974, he accepted a lateral transfer to the position of Social Insurance Program Specialist Disability, a position in the Disability Center of the

SSA's Regional Office in Manhattan. (*Id.,* at p. 31, ll. 9–19, p. 32, ll. 14–18.) In this position, Plaintiff's duties consisted of, *inter alia,* providing technical advice to SSA field officers and state Disability Determination Services ("DDSs")[3] and preparing briefings and presentations to management officials and outside groups interested in the Disability Program. (*Id.,* at p. 31, ll. 25, p. 32, ll. 2, 10–13 .)

1  Although Plaintiff has failed to submit an opposition to Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Def. Rule 56.1 Stmt.") (Dkt.43), Plaintiff has submitted both a declaration and a memorandum signed under penalty of perjury. (*See* Declaration of Anthony Milano, dated Jan. 24, 2008 ("Milano Decl.") (Dkt.57); Memorandum of Law in Support of the Plaintiff's Motion for Summary Judgment and in Opposition of [the] Government's Motion for Summary Judgment, dated Jan. 24, 2008 ("Pl.Mem.") (Dkt.56).) The Court will accept and consider these submissions, at least to the extent that they otherwise comply with Fed.R.Civ.P. 56(e). *See* Discussion *infra* at Point I(B); *see also Lorillard Tobacco, Co. v. Jamelis Grocery, Inc.,* 378 F.Supp.2d 448, 453–54 (S.D.N.Y.2005); *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (stating that where plaintiff fails to submit a proper Rule 56.1 Statement in opposition to a summary judgment motion, the Court may, in its discretion, "conduct an assiduous review of the record") (internal citation omitted). Plaintiff states that he has "[n]o disagreement" with "Section A," which apparently refers to Section A, titled "Plaintiff's Employment with SSA," of Defendant's Memorandum of Law in Support of the Government's Motion for Summary Judgment, dated Oct. 17, 2007 ("Def.Mem.") (Dkt.42).

2  The General Schedule ("GS") is a schedule of annual rates of pay for most federal civil service administrative and professional employees, consisting of 15 grades (GS–1 to GS–15). *See* 5 U.S.C. § 5332.

3  The SSA contracts with a DDS in each state and in the Commonwealth of Puerto Rico to make medical disability determinations on behalf of the SSA. (*Id.,* at p. 122, l. 25, p. 123, ll. 2–19.)

Between 1982 and 1992, Plaintiff applied, but was not selected, for 20 to 25 positions both in the Regional Office and in Field Offices. (*Id.,* at p. 35, ll. 13–20.) On June 9, 1992, however, Plaintiff was promoted to Section Supervisor in the Retirement and Insurance Section, a GS–13 position. (*Id.,* at p. 33, ll. 5–7.) Because of his prior experience with the Disability Program and at the request of Regional Office

managment, Plaintiff was reassigned to the Disability Center as a Section Supervisor, at the same grade, in May 1995, and he remained in that position until April 1996. (Id., at p. 37, ll. 8–17, p. 39, ll. 5–7.) At that point, as a result of a government-wide initiative to lower the ratio of supervisors to employees, all Section Supervisors throughout the SSA, including Plaintiff, had their positions changed to Team Leaders, a non-supervisory GS–13 position with substantially the same responsibilities. (Id., at p. 35, ll. 24–25, p. 36, ll. 2–16.) In September 2000, Plaintiff applied for and received a competitive lateral reassignment[4] to Team Leader in the Center for Security and Integrity ("CSI"), where he oversaw a team of approximately seven to 10 security specialists. (Id., at p. 40, ll. 4–17, p. 41, l. 2., p. 155, ll. 13–14.) The SSA officials involved in selecting Plaintiff for this position were Assistant Regional Commissioner for Managment and Operations Support ("ARCMOS") Robert Marmaro[5] and Regional Commissioner Beatrice Disman. (Id., at p. 159, ll. 14–21; Marinaro Decl., at ¶ 1.) In August 2006, Plaintiff was reassigned from his positions as Team Leader in CSI to a position as Program Expert in the Center for Disability. (See Milano Dep., at p. 250, ll. 19–25, p. 251, ll. 2–14.) As a result of this reassignment, Plaintiff no longer had supervisory duties, although he remained at the same grade and pay level. (Id., at p. 255, ll. 22–25, p. 256, ll. 2–9, p. 259, ll. 24–25, p. 260, ll. 2–3.)

4        This was a lateral transfer, in that the position remained at the GS–13 level. It was, however, a competitive promotion or reassignment, meaning that SSA employees were able to compete in a selection process for the position. (Id., at p. 39, ll. 24–25, p. 40, ll. 4–19.)

5        Mr. Marinaro has since retired. (See Declaration of Robert Marinaro, dated Oct. 10, 2007 ("Marinaro Decl.") (Dkt.52), at ¶ 1.)

**\*5** Throughout his career at the SSA, Plaintiff has received several performance and merit awards. (See Declaration of Julio Infiesta, dated Oct. 10, 2007 ("Infiesta DecL") (Dkt.49), Ex. G (Plaintiff's Application), at US02711–12.) Moreover, in the various positions that he has held at the SSA, he has supervised employees, managed projects and workloads, made presentations on SSA projects, and worked with State DDS management. (See generally Infiesta Decl., Ex. G.) Plaintiff has held various positions and taken courses where he has gained experience and knowledge of SSA policy and procedures, specifically in the area of disability. (Id.) Plaintiff

has also served as shop steward and then as president of a regional labor union from 1986 until 1992. (Id., at US02722.)

### B. The SSA's Employment Selection Process

The SSA follows the Management Officials Promotion Plan ("MOPP") in selecting employees for promotions. (See Pl. Mem., Ex. T (MOPP), Ex. U (additional sections of MOPP).) Under MOPP, when any SSA office has a job opening, the SSA posts Vacancy Announcements detailing the job description, as well as requirements for selection and factors used to select individuals for the vacant position. (Id., Ex. T, at 16–18.) Applicants who wish to be considered must apply as required by the announcement. (Id., at 18.)

The applications are reviewed by the personnel office, and applicants who do not meet the basic qualifications are removed from consideration. (Id., at 20–22.) The eligible applicants are then referred to either a promotional committee or one or more "HR specialist(s) and/or component management/staff official(s)," who rate the applicants, using point values awarded to each applicant based on so-called "knowledge, skills and abilities" ("KSA") factors listed in the vacancy announcement.[6] (Id., at 23–26 .) At this point, the promotional committee or other individual(s) involved in rating the applicants may rank the applicants in descending score order, determine which applicants have a score that is at least 50 percent of the total points available, and develop a tentative "Best Qualified List."[7] (Id., at 24–25.) The rated applications, points awarded, and tentative Best Qualified List are then referred to the personnel office for review and approval of a final Best Qualified List. (Id., at 25–26.)[8] If, however, an HR specialist performed the rating or was present throughout the rating session, he or she may prepare and approve a final Best Qualified List instead of forwarding the materials to the personnel office. (Id.) The approved Best Qualified List and candidates' applications are given to the selecting official to use to make his or her selection to fill the position. (Id., at 29.) The selecting official has "supervisory recommendations" and "selection interviews" available to him or her as additional sources of information. (Id.) While "selection interviews" may be conducted with one or more of the candidates, there is no requirement that such interviews be conducted. (Id.) The selecting official is to use his or her

6        A promotional committee is convened only if the number of eligible applicants is greater than 15. (Id., at 25.)

7     Only applicants who earned at least 50 percent of the total points available may be included on a Best Qualified List. (*Id.,* at 27.)

8     The Court notes that some of the Best Qualified Lists submitted by the SSA in support of its motion contain handwritten notations referring to candidates' ages or prior EEO activity. (*See, e.g.,* Infiesta Decl., Ex. E (Best Qualified List), at US02422; Ex. F (same), at US02611; Ex. G (same), at US02699.) Plaintiff does not contend that these notations were made by the SSA in connection with its review of candidates for open positions. Nonetheless, this Court inquired regarding the origin of these notations, and, in response, the SSA submitted, *inter alia,* the declaration of Carolyn Lipscomb, an Equal Employment Opportunity Specialist in the Office of Civil Rights and Equal Opportunity ("CREO") in the New York Region of the SSA. (*See* Declaration of Carolyn Lipscomb, dated Aug. 5, 2008 ("Lipscomb Deck"), at ¶ 1.) Ms. Lipscomb explains that, during the investigation of an EEO complaint alleging "discriminatory nonselection," a CREO staff member would generally annotate a copy of the Best Qualified List to show the protected status of the candidates and would then submit the annotated copy to the EEO investigator to be included in the "Report of Investigation ." (*Id.,* at ¶ 2.) Further, in some complaints alleging age and retaliatory discrimination, a CREO staff member would also annotate the Best Qualified Lists to show the ages and prior protected activity of the candidates. (*Id.,* at ¶ 3.)

\*6  personal judgment as to which of the candidates has the greatest potential for successful performance of the duties and responsibilities of the position being filled. Selecting officials should consider the candidates' overall qualifications, including work histories, work experiences and accomplishments (both paid and unpaid), training/ education and awards in relation to the knowledge, skills, abilities and other characteristics required to successfully perform the duties of the position. (*Id.*) Further, in making his or her selection, the selecting official "has the option of selecting any of the candidates" on the Best Qualified List. (*Id.*)

### C. The Repeated Selection of Candidates Other Than Plaintiff for Available Positions, and Plaintiff's Eventual Reassignment

In his Amended Complaint, Plaintiff details 22 instances between 1997 and 2006 in which he sought, but did not receive, a promotion to a GS–14 level position, despite the fact that he made the Best Qualified List each time.

In his pleading, he claims that, in each instance, he was discriminated against because of his age. (*See* Amended Complaint, dated Dec. 7, 2006 ("Am.Compl.") (Dkt.19).) Since the time his Amended Complaint was filed, however, Plaintiff has indicated that he wishes to withdraw his allegations concerning one instance when he did not receive a promotion—specifically, his allegations regarding the District Manager position listed in Vacancy Announcement 092–01U. (*See* Vassallo Decl., Ex. B (Letter to The Honorable Debra Freeman, U.S.M.J. from Plaintiff, dated Jan. 5, 2007).) In addition, while his Amended Complaint includes an allegation of age discrimination with respect to his failure to be selected for a120–day noncompetitive detail in 2004 (*see* Am. Compl., at No. 19), Plaintiff has made clear at his deposition that he is not now pursuing such a claim (see Milano Dep., at p. 78, ll. 5–8, p. 212, ll. 15–25). Accordingly, it is the Court's understanding that Plaintiff is now challenging as discriminatory Defendant's conduct in failing to promote him on 20 occasions. Plaintiff also maintains that he suffered age discrimination on two additional occasions: when a colleague's 120–day non-competitive detail was extended in 2004, depriving Plaintiff of any opportunity to seek the position, and when he was reassigned in 2006 from the supervisory position of Team Leader to the non-supervisory position of Program Expert. (*Id.*) Plaintiff further claims that all of the SSA's allegedly adverse employment actions, except for the first two instances when Plaintiff was not promoted, were also taken for retaliatory reasons, after he made his initial complaints of alleged age discrimination. (*See id.*)

The following is a summary of Plaintiff's allegations and the SSA's contentions regarding each of the 22 events presently in question:

### 1. Selection of Jane Zanca (Vacancy Announcement ROII 406–97R)

On December 15, 1997, the SSA posted Vacancy Announcement ROII 406–97R, for the position of Disability Program Administrator ("DPA"). (*See* Def. Rule 56.1 Stmt., at ¶ 2; Marinaro Decl., at ¶ 54, Ex. I (Vacancy Announcement), at US00234.) The individual filling this DPA position would be charged with ensuring that state DDSs operated in a satisfactory manner and complied with federal regulations. (*Id.*) The DPA would also be responsible for interpreting the national budget, advising state officials and evaluating and approving budget requests. (*Id.*) Applicants for the position (and, indeed, for every position at issue in this case) were evaluated based on their experience,

education, training, outside activities, and awards.[9] In addition, applicants for this position were evaluated based on their ability to manage, direct, and administer SSA programs, as well as their ability to negotiate resolutions to complex problems within the SSA and outside the agency. (*Id.,* at US00235.) Applicants were also evaluated based on their analytic and writing abilities, in addition to their communications skills. (*Id.*)

[9]    As these general evaluative criteria were considered relevant for every job opening at the SSA, they will not be repeated for every position at issue here; rather, from this point forward, the Court will only summarize the more job-specific factors that purportedly entered into the SSA's consideration of candidates for the positions in question.

**\*7** Former Director of the Disability Center Mary Gardella (the selecting official) and ARCMOS Robert Marinaro (the concurring official), selected Jane Zanca for the position. (*See* Def. Rule 56.1 Stmt., at ¶ 3; Marinaro Decl., at ¶ 55.)[10] Mr. Marinaro purports to have selected Ms. Zanca because of her impressive performance in her previous position as a Public Affairs Specialist, in addition to the strong recommendation she received from Regional Commissioner Beatrice Disman, who praised Ms. Zanca's leadership, negotiation abilities and communication skills. (*Id.*) Mr. Marinaro asserts that Mr. Milano was not selected "because he did not possess the high level of leadership and negotiation abilities necessary for this position, which Ms. Zanca did demonstrate." (*See* Marinaro Decl., at ¶ 55.) Plaintiff, though, disputes Ms. Zanca's work experience, leadership, and negotiating skills and further contends that Ms. Disman's recommendation is inadmissible hearsay evidence and that he was more qualified. (*See* Milano Decl., at 3–7.)

[10]    Ms. Zanca's application for the position is not attached as an exhibit, and, therefore, the only indication of her qualifications comes from the statements of the selecting official and the contentions of Plaintiff.

More specifically, in describing his own qualifications, Plaintiff notes his attendance and participation in several State Agency Regional Office Conferences (SAROCs), which were usually conducted annually by the Disability Center and attended by high-level SSA management officials. (*Id.,* at 5.) According to Plaintiff, Ms. Zanca was not invited to attend these "high level meetings," which supposedly demonstrates that he was more qualified than Ms. Zanca. (*Id.*) Plaintiff also points out that he was a member of the Regional

Office Reorganization Transition Team, which issued a report to the Regional Commissioner regarding possible staff and workload realignments in different SSA Centers. (*Id.*) Further, Plaintiff asserts that his service as the Vocational Rehabilitation Coordinator and the Professional Relations Coordinator during his tenure at the Disability Center, along with his receipt of two cash awards for his performance in these positions, demonstrates that he possessed both negotiation skills and program knowledge. (*Id.,* at 5–6.)[11]

[11]    Plaintiff refers again to his qualifications detailed in this paragraph when he discusses the selections of other individuals (specifically, Richard Dooley, Vera Bostick–Borden, Irene Corva, Bonnie Muir, Richard Anderson, Kathleen Skrupskis, Norma Lefebrve, Raymond Egan, and Marie Martinez–Wolcott) for other positions for which he applied. (*See infra* at Point C(2–6, 10, 12, 17, 19, 20).)

With respect to this DPA position, as well as each of the other GS–14 positions for which Plaintiff applied, Plaintiff maintains—and the SSA does not appear to contest—that he was older than the candidate selected.[12] (*See, e.g.,* Milano Decl., at 7 .)

[12]    The only time when Plaintiff does not explicitly state that he was older than the selected candidate is in the case of Raymond Egan's selection. (*See infra* at Point C(19).) Yet, as Plaintiff claims that he was discriminated against based on his age with respect to that selection, it appears that Plaintiff is asserting that he was older than Mr. Egan (*see* Am. Compl., at No. 22; Milano Decl., at 29–30), and the SSA does not suggest otherwise.

### 2. Selection of Richard Dooley (Vacancy Announcement ROII 422–98R)

On October 5, 1998, the SSA posted Vacancy Announcement ROII 422–98R for another DPA position. (*See* Marinaro Decl., Ex. A (Vacancy Announcement), at US00048.) This DPA's duties were to include assuring that state DDSs operated in a satisfactory manner and complied with federal regulations. (*Id.*) The DPA would also be responsible for interpreting the national budget, advising state officials, and evaluating and approving budget requests. (*Id.*) Applicants were evaluated based on their analytic abilities, as well as their abilities to provide a working knowledge of SSA programs, to provide technical knowledge of the disability program, and to formulate or revise disability policy. (*Id.,* at US00049.)

**\*8** Mr. Marinaro, the selecting official,[13] states that he chose Richard Dooley because of his negotiation and leadership skills, as well as because of his own observations of Mr. Dooley's work and recommendations from previous supervisor attesting to the same. (See Def. Rule 56.1 Stmt., at ¶ 6; Marinaro Decl., at ¶ 6.) According to Mr. Marinaro, Mr. Dooley showed strong negotiation and leadership skills when, for example, during a four-month period, Mr. Dooley successfully negotiated the acquisition of office space for three or four SSA field offices and supervised the preparation of these spaces for occupation. (See Marinaro Decl., at ¶ 6.) Mr. Dooley further exhibited these skills, according to Mr. Marinaro, when he organized a Regional Conference attended by more than 300 people. (Id.)

[13]   Ms. Disman was the concurring official for this position and for each incident of Plaintiff's non-selection hereinafter. For each position at issue, the selecting official has submitted a declaration to the Court, stating that he was responsible for selecting the candidate to fill the position at issue; none describe any specific input that Ms. Disman may have had. (See, e.g., Marinaro Decl., at ¶ 3.) Under the circumstances, only the statements of the selecting officials will be referred to hereafter.

Mr. Marinaro claims that, although Plaintiff had some negotiation experience as a union representative, Plaintiff failed to demonstrate the "wide ranging negotiation skills that Mr. Dooley exhibited." (Id., at ¶ 7.) Plaintiff contends that his job performance and experience surpassed that of Mr. Dooley, that Mr. Dooley did not have the required specialized experience as described in the vacancy announcement, and that the recommendation from Mr. Dooley's supervisor lacks documentation and is therefore "hearsay." (See Milano Decl., at 7–8.) Plaintiff maintains that he had extensive negotiation experience, which he gained as a shop steward and as the Chapter President of Chapter 218 of the National Treasury Employees Union. (Id., at 7.) [14]

[14]   Plaintiff first filed a complaint with an Equal Employment Opportunity counselor, on November 20, 1998, after he was not selected for the position of Disability Program Administrator. (Milano Dep., at p. 111, ll. 8–11.) He alleges that, after that date, all of Defendant's challenged conduct was not only discriminatory, but also retaliatory.

According to Plaintiff, Mr. Dooley was 48 at the time of his selection, and Plaintiff was 57. (Id., at 9.)

### 3. Selection of Vera Bostick–Borden (Vacancy Announcement ROII 536–00R)

On April 5, 2000, the SSA posted Vacancy Announcement ROII 536–00R for the position of Supervisory Social Insurance Specialist, commonly known as the Disability Center Director. (See Marinaro Decl., at ¶ 10, Ex. B (Vacancy Announcement), at US00380.) The Disability Center Director's responsibilities would include providing guidance to team leaders and implementing and managing the New York Region [15] disability programs. (Id.) Further, according to Mr. Marinaro, the Director of the Disability Center would be required to interact with high-level DDS, Regional Office, and Central Office officials. (Id., at ¶ 11.) Applicants were evaluated based on the extent of their experience demonstrating an ability to direct, manage, and administer SSA programs and to negotiate resolutions to complex problems with individuals and groups outside the SSA, as well as the quality of their communication skills. (Id., Ex. B, at US00381.) For this vacancy, each candidate on the Best Qualified List was interviewed. (Id., at ¶ 12; Milano Dep., at p. 145, ll. 23–25, p. 146, l. 2.)

[15]   The New York Region of the SSA covers Social Security operations within New York and New Jersey, as well as the Commonwealth of Puerto Rico and the territory of the Virgin Islands. (Declaration of Dominic Fulgieri, dated Oct. 10, 2007 ("Fulgieri Decl.") (Dkt.47), at n.l.)

Mr. Marinaro, the selecting official, asserts that he chose Vera Bostick–Borden based on her presentation during her interview, the recommendation of her supervisor, and her prior experience interacting between the field offices, state DDSs, and the Regional Office. (See Def. Rule 56.1 Stmt., at ¶ 8.) During her interview, according to Mr. Marinaro, Ms. Bostick–Borden "came across very powerfully," and "her presentation, delivery, and presence were outstanding," which was important because the employee selected would need to be "comfortable in a high visibility position." (Marinaro Decl., at ¶ 13.) When asked at her interview what she would change about the Disability Center, Ms. Bostick–Borden explained specific weaknesses and how she would direct and improve the Center. (See id.) Additionally, she had received 18 awards, including a Commissioner's Citation, which is the highest award that can be given to SSA employees. (Id., Ex. B (Application of Ms. Bostick–Borden), at US00402.) On the other hand, Mr. Marinaro states that Plaintiff's supervisor did not highly recommend Plaintiff and that he "was not impressive during his interview." (Id., at ¶ 14.)

**\*9**  According to Mr. Marinaro, when asked what he would change about the Disability Center, Plaintiff "said not much," and when asked what he would improve about the Center, Plaintiff's responses were "bland and did not articulate any way of improving the operations of the Disability Center." (*Id.*) While Mr. Marinaro acknowledges Plaintiff's many years of experience in the Disability Center, he purportedly felt that Ms. Bostick–Borden had a better understanding of "what needed to be done to improve the Disability Policy Operations Center." (*Id.,* at ¶ 14.)

According to Plaintiff, Mr. Marinaro's characterization of Plaintiff's responses to interview questions is "ludicrous" (*see* Milano Decl., at 9); Plaintiff asserts that he in fact stated that there needed to be increased oversight of the New Jersey DDS (*see* Milano Dep., at p. 147, ll. 2–7). Plaintiff contends that, had the SSA provided the notes from his interview, he would have been able to rebut Mr. Marinaro's contentions, and he asks the Court to draw an "adverse inference" from the SSA's failure to produce those notes. (*See* Milano Decl., at 10.) In addition, Plaintiff notes that the SSA has provided no documentation of Ms. Bostick–Borden's supervisor's supposed recommendation. (*Id.*)

Moreover, Plaintiff maintains that he was more qualified than Ms. Bostwick–Borden for the position, as he had more years of experience than she did. (*Id.,* at 11–12.) Plaintiff specifically points out that he had 20 years of experience at the Disability Center, while Ms. Bostwick–Borden did not have prior work experience there. (*Id.*) To demonstrate that he was more qualified, Plaintiff also notes that he attended and was involved with conferences held by the Disability Center for the Work Incentive Network, which is a coalition of agencies and advocacy groups that share information to assist individuals with disabilities return to work, and that Ms. Bostick–Borden was not invited to attend these conferences. (*Id.,* at 10–11.)

Plaintiff does not provide Ms. Bostwick–Borden's age at the time of her selection, but he does contend that Ms. Bostwick–Borden was younger than he. (*Id.,* at 12.)

### 4. Selection of Irene Corva (Vacancy Announcement ROII 560–00R)
On June 22, the SSA posted Vacancy Announcement ROII 560–00R for the position of Director of the newly-created Center for Security and Integrity ("CSI"). (*See* Def.

Rule 56.1 Stmt., at ¶ 9; Marinaro Decl., Ex. C (Vacancy Announcement), at US00433.) The CSI Director's duties were to include providing supervision and guidance to staff of the CSI, implementing and managing the security and integrity of the SSA system, and preventing fraud. (*See* Marinaro Decl., Ex. C, at US00433.) [16]

16    No specific evaluation factors appear in this Vacancy Announcement.

Mr. Marinaro, the selecting official, states that he chose Irene Corva because she had distinguished herself as Team Leader for the Security and Fraud Prevention Team and had earned a national reputation for her work in security and fraud prevention through participation in regional and national workgroups, trainings, and presentations. (*See* Def. Rule 56.1 Stmt., at ¶ 10.) Additionally, Mr. Marinaro points out that Ms. Corva had received three Honor Awards and numerous other monetary awards for her achievements in security and fraud prevention. (*See* Marinaro Decl., at ¶ 20, Ex. C (Application of Irene Corva), at US00460–61.) According to Mr. Marinaro, "[n]one of the other candidates, including [Plaintiff], had distinguished themselves at the regional and national level in the same manner as Ms. Corva." (Marinaro Decl., at ¶ 21.) Plaintiff, though, claims that he has more years of experience than Ms. Corva and that his 25 years as Program Specialist and Team Leader in the Regional Office made him equally qualified to Ms. Corva for this position. (*See* Milano Decl., at 12; Milano Dep., at p. 153, ll. 5–8.)

**\*10**  Although he does not provide her age at the time of her selection, Plaintiff also claims that Ms. Corva was younger than he. (*See* Milano Decl., at 12.)

### 5. Selection of Bonnie Muir (Vacancy Announcement ROII 594–00R)
On August 14, 2000, the SSA posted Vacancy Announcement ROII 594–00R for the position of Social Insurance Specialist, a temporary detail to the State of New Jersey. (*See* Marinaro Decl., Ex. D (Vacancy Announcement), at US00497.) The New Jersey DDS had a history of difficulty processing disability claims, and the SSA had developed an implementation plan, which called for an SSA representative to be located onsite in New Jersey. (*Id.,* at ¶ 24.) Thus, the Social Insurance Specialist position was a specially created position for an individual whose primary function would be to serve as the federal coordinator for process improvement initiatives at the New Jersey DDS. (*Id.,* Ex. D, at US00497.) Applicants were evaluated based on experience demonstrating their ability to

provide a working knowledge of SSA programs and technical knowledge of the disability program, as well as their ability to formulate and/or revise disability policy and their analytic ability. (*Id.,* at US00498.)

Mr. Marinaro, the selecting official, states that he chose Bonnie Muir, an employee of the SSA since 1973 (*id.,* Ex. D (Application of Bonnie Muir), at US00513), for the position because she was uniquely qualified to bring immediate improvement to the New Jersey DDS (*id.,* at ¶ 25). Mr. Marinaro knew that Ms. Muir was an attorney who had received recognition for her expertise in disability law and processes, had coordinated disability redesign activities in the New York Region, and had extensive experience dealing with DDSs, including an eight-month detail as Executive Assistant to the New Jersey DDS Director. (*See id.,* at ¶¶ 25–28; Def. Rule 56.1 Stmt., at ¶ 12.) Mr. Marinaro also considered Ms. Muir's receipt of several awards for her work in the area of disability, including a Commissioner's Citation, a Deputy Commissioner's Citation, and a Regional Commissioner's Citation. (*See* Marinaro Decl., at ¶ 27.) While Mr. Marinaro claims to have recognized that Plaintiff had many years of experience in the disability field and had supervised Ms. Muir for approximately three months, he explains that he believed that Ms. Muir's achievements at the GS–13 level and her experience on detail to the New Jersey DDS demonstrated that she was "better suited to fill the position." (*Id.,* at ¶ 28.)

In disputing Mr. Marinaro's account of Ms. Muir's qualifications, Plaintiff states that Ms. Muir "embellished her list of accomplishments" and questions whether she actually served as Executive Assistant to the DDS Director, as he contends that there was no federal "Executive Assistant" position. (Milano Decl., at 13–14.) According to Plaintiff, he was more qualified than Ms. Muir as he had supervisory experience, which she did not have, and he had more years of experience overall and at the Center for Disability. (*See id.,* at 16.) Further, Plaintiff claims that management's failure to notify him personally of the position's creation humiliated him, the position did not require a law degree, and Ms. Muir was pre-selected for the position.[17] (*Id.,* at 12–13, Milano Dep., at p. 163, ll. 9–14.)

17    In his deposition, Plaintiff stated that there was a "rumor" around the office that Ms. Muir wrote the description of the position to suit her own qualifications. (*See* Milano Dep., at p. 163, ll. 9–25, p. 164, ll. 2–13.)

**\*11** Plaintiff does not provide Ms. Muir's age at the time of her selection, but he does assert that she was younger than he. (*See* Milano Decl., at 16.)

### 6. Selection of Richard Anderson (Vacancy Announcement ROII 642–00R)

On November 20, 2000, the SSA posted Vacancy Announcement ROII 642–00R for the position of Social Insurance Specialist (Project Manager), a temporary position created to assist the New Jersey DDS with implementing recommendations from an SSA audit. (Def. Rule 56.1 Stmt., at ¶ 13; Marinaro Decl., Ex. E (Vacancy Announcement), at US00552.) The SSA conducted an audit of the New Jersey DDS in early 2000 and created the New Jersey DDS Process Review Team. (*See* Marinaro Decl., at ¶ 32.) This DDS was having difficulty meeting quarterly goals, and the Review Team evaluated DDS operations and made recommendations to improve production and quality. (*Id.,* at ¶¶ 31–32.) After the audit, Richard Anderson, a member of the audit team, worked with the New Jersey DDS to create an implementation plan and subsequently received a four month non-competitive detail to this DDS as a GS–14 to assist with implementing the recommendations. (*Id.*) Approximately one month into this detail, the Regional Office was allowed to fill this position for one year, which led to the Vacancy Announcement. (*Id.*)

The Social Insurance Specialist, or project manager, was to advise the Federal Coordinator and New Jersey DDS management and participate in the formulation of short and long range work plans, goals, budget requirements, policies, and procedures necessary to implement process improvement initiatives. (*Id.,* Ex. E, at US00552.) Applicants were evaluated based on their experience demonstrating an extensive knowledge of SSA programs and/or operations and Management and Personnel policies and procedures, as well as their leadership and managerial abilities. (*Id.,* at US00553.) Applicants were also evaluated based on their ability to prepare complex written analyses of programs, reports and Management Projects. (*See id.*)

Mr. Marinaro, the selecting official, purportedly chose Mr. Anderson because he had been involved both in conducting the audit and implementing the audit team's recommendations regarding this particular project since May 2000, and because Dominic Fulgieri, the head of the audit team, reported that Mr. Anderson had done an excellent job in both phases of the project. (Def. Rule 56.1 Stmt., at ¶ 14.) While not directly disputing Mr. Anderson's qualifications, Plaintiff states that

Mr. Anderson's prior detail in this position is evidence of pre-selection and that Mr. Fulgieri's recommendation is not documented. (*See* Milano Decl., at 17.) He also maintains that Mr. Anderson had no Regional Office experience, while Plaintiff had 26 years of such experience, with 20 years specifically in the Disability Center. (*Id.,* at 18.)

Although he does not provide Mr. Anderson's age at the time of his selection, Plaintiff does contend that Mr. Anderson was younger than he. (*Id.*)

### 7. Selection of Richard Solow (Vacancy Announcement ROII 645–00R)

**\*12** On November 22, 2000, the SSA posted Vacancy Announcement ROII 645–00R for the position of Supervisory Management Analyst, commonly known as the Human Resources Center Director. (Def. Rule 56.1 Stmt., at ¶ 15; Marinaro Decl., Ex. F (Vacancy Announcement), at US00620.) Applicants were evaluated based on, *inter alia,* their knowledge of administrative, management and personnel policies, their ability to negotiate and to achieve results through others, and their communication and analytic abilities. (*See* Marinaro Decl., Ex. F, at US00623–27.)

Mr. Marinaro, the selecting official, states that he chose Richard Solow due to his extensive experience as a human resource professional in the New York Region. (*Id.,* at ¶ 37.) Prior to his selection, Mr. Solow had served in the Regional Office as Team Leader for the Personnel Policy team, where his team had been responsible for resolving all employee relations matters, administering the SSA awards, dealing with labor relations issues, making appearances before third parties, and encouraging recruitment. (*Id.*) Mr. Marinaro also asserts that he considered Mr. Solow's receipt of a Commissioner's Citation for outstanding leadership and expertise in support of human resource management programs. (*Id.*) Although Plaintiff had experience as a union official, Mr. Marinaro did not believe such experience made Plaintiff better qualified than Mr. Solow, who, according to Mr. Marinaro, had much more relevant experience. (*Id.,* at ¶ 38.)

According to Plaintiff, this job opening was for a "director's job," the main function of which would be "managing a center." (Milano Dep., at p. 175, ll. 4–5.) Plaintiff maintains that he and Mr. Solow were equally qualified for this position, as both had been GS–13 Team Leaders. (*See id.,* at p. 174, ll. 23–25, p. 175, ll. 2, 5–6.) Further, Plaintiff claims that Mr.

Marinaro's purported willingness to give considerable weight to Mr. Solow's specialized experience in human resources undermines Mr. Marinaro's apparent position that Plaintiff's own specialized experience—in the disability field—would not have been relevant for the various positions for which he applied.[18] (*See* Milano Decl., at 18.)

[18]   Plaintiff is specifically referring to his consideration by Mr. Marinaro for the positions ultimately filled by Ms. Zanca, Mr. Dooley, Ms. Bostick–Borden, Ms. Muir, and Mr. Anderson. (*See* Milano Decl., at 18.)

Plaintiff does not provide Mr. Solow's age at the time of his selection, but he does assert that Mr. Solow was younger than he. (*Id.*)

### 8. Selection of Joan Freeburn (Vacancy Announcement ROII 658–00R)

On December 18, 2000, the SSA posted Vacancy Announcement ROII 658–00R for the position of Equal Opportunity ("EEO") Manager. (Def. Rule 56.1 Stmt., at ¶ 17; Declaration of Martin Taffet, dated Oct. 5, 2007 ("Taffet Decl.") (Dkt.50), Ex. A (Vacancy Announcement), at US00768.) The individual selected for this position was to manage the equal opportunity program for the region. (Taffet Decl., Ex. A, at US00768.) In 2000, the SSA created a new position description for the EEO Manager and reclassified the position from a GS–13 position to a GS–14 position. (*Id.,* at ¶ 3.) As a result of this reclassification, the incumbent EEO Manager, Joan Freeburn, was required to apply and compete with other candidates. (*Id.*)

**\*13** Mr. Taffet, the Deputy Regional Commissioner[19] and selecting official, chose Ms. Freeburn. (*Id.,* at ¶ 6.) In her prior position, Ms. Freeburn had worked closely with the Regional Commissioner's Office, where Mr. Taffet also worked. (*Id.*) According to Mr. Taffet, he was personally familiar with her work and was impressed with it. (*Id.*) Mr. Taffet spoke with Mr. Marinaro about Plaintiff's candidacy, and they purportedly agreed that Plaintiff could "grow into" the position and that he had "average potential for the job." (*Id.,* at ¶ 5.) Mr. Taffet states that, ultimately, he selected Ms. Freeburn, after weighing her "proven experience and performance in that specialized subject area versus [Plaintiff's] potential to do the work." (*Id.,* at ¶ 6.)

[19]   Mr. Taffet has since retired. (*Id.,* at ¶ 1.)

Plaintiff claims that he was equally qualified for this position, as "[w]hat they're really look [*sic*] for is a manager to direct other individuals and to direct the [EEO] Program in the region." (*See* Milano Dep., at p. 191, ll. 12–17, 20–23.) According to Plaintiff, he had more years of experience as a supervisor and Team Leader than Ms. Freeburn, and he also had applicable EEO experience, which he gained by being a supervisor, representing union members in EEO complaints, and processing his own EEO case. (*See* Milano Decl., at 19.) Moreover, Plaintiff contends that Mr. Taffet's purported willingness to give considerable weight to Ms. Freeburn's specialized experience in the EEO area undermines the apparent position of other selecting officials that Plaintiff's own specialized experience in the disability field would not have been relevant for the various positions for which he applied. (*Id.*)

Although he does not specify Ms. Freeburn's age at the time she was selected, Plaintiff states that she was significantly younger than he. (*Id.*)

### 9. Selection of Thomas McDevitt (Vacancy Announcement ROII 032–01R)

On March 20, 2001, the SSA posted Vacancy Announcement ROII 032–01R for the position of Teleservice Center Director. (*See* Def. Rule 56.1 Stmt., at ¶ 19; Taffet Decl., Ex. B (Vacancy Announcement), at US00825.) Similar to the EEO Manager (*see supra*, at Point C(8)), this position was reclassified as a GS–14 position, and the incumbent was required to apply and compete with other candidates for the reclassified position. (*See* Taffet Decl., at ¶¶ 3, 10; Milano Dep., at p. 194, ll. 3–14.)

Mr. Taffet, the selecting official, chose the incumbent, Thomas McDevitt, purportedly because he had performed well in this Teleservice Center Director position, where he had served for several years at the GS–13 grade level. (*See* Taffet Decl, at ¶ 10.) While Mr. Taffet asserts that he "did not see anything negative about what [Plaintiff] could bring to the Teleservice Center Director position," he chose Mr. McDevitt because of his "actual experience and performance" and "for continuity purposes." (*Id.*)

 **\*14**  According to Plaintiff, he was equally qualified for this position because "it's a managerial job," and "[y]ou don't have to be a technical expert to manage the TSC centers." (Milano Dep., at p. 194, ll. 18–20.) [20] Further, Plaintiff notes that he

had 26 years of service in the Regional Office, while Mr. McDevitt had 11. (Milano Decl., at 20.)

> 20    Again, Plaintiff maintains that Mr. Taffet's reliance on Mr. McDevitt's specialized experience is inconsistent with the alleged failure of other selecting officials to consider Plaintiff's specialized experience in the disability field, in connection with other open positions. (Milano Decl., at 20.)

Although he does not provide Mr. McDevitt's age at the time of selection, Plaintiff asserts that Mr. McDevitt was significantly younger than he. (*Id.*)

### 10. Selection of Richard Anderson [21] (Vacancy Announcement ROII 37–01R)

> 21    This is the same Richard Anderson as was selected for the temporary position of Social Insurance Specialist (Program Manager) in 2000. (*See supra*, at Point C(6).)

On March 26, 2001, the SSA posted Vacancy Announcement ROII 37–01R for the position of DPA for the New Jersey DDS. (*See* Def. Rule 56.1 Stmt., at ¶ 21; Marinaro Decl., Ex. G (Vacancy Announcement), at US00675.) The DPA's duties would include ensuring that the New Jersey DDS performed in a satisfactory manner and complied with federal regulations. (*See* Marinaro Decl., Ex. G, at US00675.) The DPA would also be responsible for interpreting the national budget, evaluating and approving budget requests, advising state officials, and reviewing fiscal audit reports of disability operations. (*Id.*)

Mr. Marinaro, the selecting official, states that he chose Mr. Anderson because he had distinguished himself as a member of the team that audited the New Jersey DDS and was "doing an excellent job in his Project Manager position, ensuring that the recommendations of the audit team were implemented." (*Id.*, at ¶ 42.) [22] Moreover, Mr. Marinaro had received excellent feedback about his performance from the Disability Center Director and officials at the New Jersey DDS. (*Id.*) Although Mr. Marinaro purportedly recognized that Plaintiff had many years of experience in the disability area and was capable of doing this job, he did not believe it was in the best interest of the SSA to select a candidate other than Mr. Anderson, as he was already successfully working with the New Jersey DDS to improve its processing. (*Id.*, at ¶ 43.)

22    Mr. Anderson's prior work performance is discussed
      above. (*See supra*, at Point C(6).)

According to Plaintiff, he was more qualified for this position
than Mr. Anderson because Plaintiff had over 20 years of
specialized experience in disability, whereas Mr. Anderson's
specialized experience applicable to this position consisted
only of the prior five months as Project Manager. (*See* Milano
Dep., at p. 179, ll. 12–18; Milano Decl., at 21.) Additionally,
Plaintiff notes that the excellent feedback regarding Mr.
Anderson that Mr. Marinaro claims to have received is not
documented. (*See* Milano Decl., at 20.)

Although he does not provide Mr. Anderson's age at the
time of his selection, Plaintiff claims that Mr. Anderson was
younger than he. (*Id.,* at 21.)

### 11. Selection of Richard Heyniger (Vacancy Announcement ROII 031–02U)

On February 11, 2002, the SSA posted Vacancy
Announcement ROII 031–02R for the position of District
Manager in the Midtown Manhattan Field Office, a temporary
position that was not to exceed one year. (*See* Def. Rule
56.1 Stmt., at ¶ 23; Fulgieri Decl., Ex. A (Vacancy
Announcement), at US00931.) The individual in this position
would be responsible for administering all phases of the social
insurance program in a district office and establishing and
maintaining management controls to measure workloads and
to ensure the timely processing of claims. (*Id.*) Applicants
were required to have experience demonstrating their ability
to work with responsible officials to plan and coordinate
activities; they were also required to have a demonstrated
ability to organize work assignments and apply sound
management practices. (*Id.,* at US00932.)

 *15  Mr. Fulgieri, an Area Director in the New York
Region and the selecting official, states that he chose Richard
Heyniger because of his performance as Manager at the
Jamaica Teleservice Center, where he was responsible for
170 employees, as well as the strong recommendation of his
supervisor, Teleservice Director Thomas McDevitt. (*Id.,* at ¶¶
4–6.) According to Mr. Fulgieri, this supervisory experience
was critical because a District Manager is responsible for
supervising all of the employees in a particular field office.
(*Id.,* at ¶ 5.) Mr. Fulgieri, who had supervised Plaintiff as
Team Leader in the Disability Center for about 15 months,
explains that he did not select Plaintiff because Plaintiff
had supervised fewer employees than Mr. Heyniger, had not
worked in a field office since 1974, and had to be counseled

by Mr. Fulgieri for not communicating with his staff. (*Id.,* at
¶ 6.) Additionally, Mr. Fulgieri states that he spoke to Irene
Corva, Plaintiff's supervisor at that time, who purportedly
confirmed that Plaintiff was hardworking, but that he did not
have the necessary team-building and leadership skills. (*Id.*)

Plaintiff maintains that he was more qualified than Mr.
Heyniger for this position because he had field office and
Regional Office experience, as well as experience with state
DDSs and the Office of Hearings and Appeals, while Mr.
Heyniger only had field office and teleservice experience.
(Milano Decl., at 21.) Furthermore, Plaintiff asserts, although
without documentary support, that he had supervised more
higher grade (GS–12 and 13) professionals than Mr. Heyniger
had, and that Mr. Heyniger had not worked in a field
office since 1984. (*Id.,* at 21–22.) Plaintiff also disputes
Mr. Fulgieri's assessment of his performance, noting that he
received awards during Mr. Fulgieri's tenure. (*Id.,* at 22.) With
respect to Ms. Corva's supposedly critical assessment of him,
Plaintiff notes that the assessment is not documented. (*Id.*)

Although he does not specify Mr. Heyniger's age at the
time he was selected, Plaintiff states that Mr. Heyniger was
significantly younger than he. (*Id.*)

### 12. Selection of Kathleen Skrupskis (Vacancy Announcement ROII 083–02R)

On April 26, 2002, the SSA posted Vacancy Announcement
ROII 083–02R for the temporary position of Social Insurance
Specialist (Project Manager). (Def. Rule 56.1 Stmt., at ¶
25; Marinaro Decl., Ex. H (Vacancy Announcement), at
US00730.) This position was created because the SSA
discovered that it owed millions of dollars to Supplemental
Security Income ("SSI") beneficiaries and the states that
provided some of the funding for the SSI program. (*See*
Marinaro Decl., at ¶ 47.) Consequently, the SSA had to
reevaluate thousands of claims, and this Project Manager was
to oversee the project in the New York Region. (*Id.;* Milano
Dep., at p. 182, ll. 5–25.) Applicants were evaluated based on
their knowledge of the Social Security program and disability
policy, their ability to plan and organize the work of others,
and their analytic and communication skills. (*See* Marinaro
Decl., Ex. H, at US00731.)

 *16  Mr. Marinaro, the selecting official, states that he
chose Kathleen Skrupskis because she had been heavily
involved in this project, at both the regional and national
level, since its beginning in 2000. (*Id.,* at ¶ 49.) She had

served as Regional Coordinator for the project, wrote and delivered a national training video on the subject, and participated in the workgroups that developed the training package and the process for handling the workload. (*Id.*) In addition, Ms. Skrupskis had helped coordinate the Work Incentive Network, which is a coalition of agencies and advocacy groups that share information to assist individuals with disabilities in returning to work. (*Id.,* at ¶ 50.) Mr. Marinaro purportedly took into consideration the Regional Commissioner's Citations that Ms. Skrupskis received for her work on the SSI claims project and as a member of the team that worked on the Work Incentive Network. (*Id.,* at ¶¶ 49–50.) Overall, according to Mr. Marinaro, Ms. Skrupskis demonstrated that she had the "excellent planning, organizing, and training skills," as well as the technical knowledge in disability programs that Mr. Marinaro believed were required. (*Id.,* at ¶ 50.)

Although Mr. Marinaro recognized that Plaintiff had technical knowledge in the disability programs and many years in the Disability Center, he states that he considered that Ms. Skrupskis had been "already working on the project for over a year and one-half, and doing an outstanding job when [this position] became available." (*Id.,* at ¶ 51.) Plaintiff, though, claims that Ms. Skrupskis was pre-selected for the position and that her involvement with the Work Incentive Network has been exaggerated. (*See* Milano Decl., at 22–23.) Further, Plaintiff maintains that he was more qualified that Ms. Skrupskis because he served as an "informal Project Manager" for nine months while at the Disability Center and because his overall years of experience, especially his specialized experience in the Disability Center, exceeded that of Ms. Skrupskis. (*See* Milano Dep., at p. 183, ll. 14–25, p. 184, ll. 2–12; Milano Decl., at 24.)

According to Plaintiff, at the time of her selection, Ms. Skrupskis was significantly younger than he. (*Id.,* at 24.)

### 13. Selection of Kevin Ryan (Vacancy Announcement ROII 159–02R)
On September 9, 2002, the SSA posted Vacancy Announcement ROII 159–02R for the position of Management Analyst (Project Manager). (*See* Def. Rule 56.1 Stmt., at ¶ 27; Infiesta Dec., Ex A (Vacancy Announcement), at US02081.) The individual selected for this position was to act as the advisor to the Regional Commissioner and provide management and operations support for strategic planning and acquiring competitive sourcing. (*See* Infiesta

Decl., Ex. A, at US02082.) According to Mr. Infiesta, the current ARCMOS in the New York Region and the selecting official, this position was created to coordinate the New York Region's competitive sourcing responsibility as part of a government-wide initiative to identify federal jobs that could be outsourced to the private sector, and one of the primary functions of the position would be to compare the costs to SSA of certain federal jobs to the costs of outsourcing the jobs. (*See* Infiesta Decl., at ¶¶ 1, 7.)

**\*17** Mr. Infiesta states that he chose Kevin Ryan because he had the financial experience to perform the analysis required for the job and had worked for approximately 11 years as Team Leader or Section Chief of Financial Management. (*Id.,* at ¶ 8.) In these previous jobs, Mr. Ryan was responsible for preparing budget forecasts and financial operating plans for the New York Region, as well as for overseeing ongoing analysis of the Region's finances to determine whether supplemental budget requests were needed. (*Id.,* at ¶ 8, Ex. A (Application of Kevin Ryan), at US02105–26.) According to Mr. Infiesta, although Plaintiff had experience in the Disability Center and the CSI, he did not have the financial analysis experience necessary for this position, and his "background did not compare favorably to Mr. Ryan['s] based on the duties of the Project Manager Position." (*Id.,* at ¶ 9.)

Plaintiff claims that he was more qualified than Mr. Ryan for the position because he had more years of service overall, as well as at the Regional Office, and because he had worked in three operational centers. (*See* Milano Dep., at p. 290, ll. 10–12, 15–20; Milano Decl., at 25.) Further, according to Plaintiff, specialized financial experience was not listed as a job requirement for this position, nor was it necessary for the bulk of the work that was actually to be performed by this Project Manager. (*See* Milano Decl., at 24.) Even if a financial background was necessary, Plaintiff contends that he was qualified because he had applicable college and law school credits and had completed a three-day training program on the federal budget process. (*Id.*)

Although Plaintiff does not supply Mr. Ryan's age at the time of selection, he contends that Mr. Ryan was younger than he. (*Id.,* at 25.)

### 14. Selection of Janet Mullarkey (Vacancy Announcement ROII 204–02U)

On December 10, 2002, the SSA posted Vacancy Announcement ROII 204–02U for the position of Director of the Program Operations Center. (*See* Def. Rule 56.1 Stmt., at ¶ 29; Declaration of Roy Snyder, dated Oct. 11, 2007 ("Snyder Decl.") (Dkt.46), Ex. A (Vacancy Announcement), at US02176.) The Director would be responsible for supervising the Team Leaders and Regional Office staff of two teams that would provide advice and support regarding the Retirement Survivors Insurance Program and the Supplemental Security Income program. (*See* Snyder Decl., at ¶ 6, Ex. A, at US02176.) At the time of the Vacancy Announcement, Janet Mullarkey was serving at the Acting Director of the Programs Operations Center. (*See* Snyder Decl., at ¶ 7; Milano Dep., at p. 301, ll. 21–23 .)

Roy Snyder,[23] the selecting official, states that he chose Ms. Mullarkey because of his personal observations of her performance as Acting Director, and because she had the necessary programmatic experience, as well as experience providing field offices with guidance. (*See* Snyder Decl., at ¶ 7.) Ms. Mullarkey's prior experience included serving as the Executive Assistant in the Regional Commissioner's Office, in addition to serving many years managing a field office. (*Id.*) Plaintiff, though, claims that he was more qualified for the position than Ms. Mullarkey because he had more experience in the SSA and in the Regional Office in particular, and he had experience as a Section Chief in the Programs Operations Center. (*See* Milano Decl., at 25.)

[23]   Mr. Snyder is employed as the Deputy Associate Commissioner for the Office of Telephone Services, but served as the Acting ARCMOS in the New York Region from November 2002 until June 2003. (*See* Snyder Decl., at ¶ ¶ 1–2.)

**\*18** Although he does not provide her age as of the time of her selection, Plaintiff states that Ms. Mullarkey was significantly younger than he. (*Id.*)

### 15. Selection of Richard Heyniger (Vacancy Announcement ROII 207–02U)

On December 17, 2002, the SSA posted Vacancy Announcement ROII 207–02U for the position of District Manager in the Midtown Manhattan Field Office. (*See* Def. Rule 56.1 Stmt., at ¶ 31; Infiesta Decl., Ex. B (Vacancy Announcement), at US01934.) This District Manager would be responsible for administering the social insurance program and assisting in establishing and maintaining management controls to measure workloads and to ensure timely processing of claims. (*See* Infiesta Decl., Ex. B, at US01934.) Richard Heyniger had been selected over Plaintiff for this position on a temporary basis (*see supra,* at Point C(11)), when the prior District Manager was temporarily reassigned. (*See* Infiesta Decl ., at ¶ 13.) The permanent position as District Manager became available in late 2002, when the prior District Manager retired from federal service. (*Id.*)

Mr. Infiesta, the selecting official, purportedly chose Mr. Heyniger because he had done an excellent job during the eight to nine months he held the position. (*Id.,* at ¶ 14.) In addition, according to Mr. Infiesta, Mr. Heyniger's supervision of more than 100 employees, as a manager of the Jamaica Teleservice Center, showed that he was capable of running a field office. (*Id* .) Mr. Infiesta states that he did not select Plaintiff because Plaintiff had not supervised as many employees as Mr. Heyniger and had not worked in field office management since 1974. (*Id.,* at ¶ 15.) For his part, Plaintiff continues to maintain that he was more qualified for the position than Mr. Heyniger, and more "well rounded," due to his overall experience of having worked in both a field office and the Regional Office. (Milano Dep., at p. 311, ll. 5–15, 25, p. 213, ll. 2–6.) In general, in explaining why, in his view, he was more qualified for this permanent position than Mr. Heyniger, Plaintiff advances the same reasons as to why he believed himself more qualified for the original, temporary position. (*See supra,* at Point C(11); Milano Decl., at 25.)

### 16. Selection of Dean Frenkian (Vacancy Announcement ROII 081–03NY)

On June 10, 2003, the SSA posted Vacancy Announcement ROII 081–03NY for the position of District Manager at the Field Office in Paterson, New Jersey. (*See* Def. Rule 56.1 Stmt., at ¶ 33; Declaration of Frederick Maurin, dated Oct. 9, 2007 ("Maurin Decl.") (Dkt.51), Ex. A (Vacancy Announcement), at US3086.) The position's responsibilities were to include administering the social insurance program in a field office and assisting in establishing and maintaining management controls to measure workloads and to ensure the timely processing of claims. (*See* Maurin Decl., Ex. A, at US3086.) Applicants were evaluated based on experience demonstrating their knowledge of SSA programs, as well as their ability to organize, direct and control the work of an organization through one or more subordinate management employees. (*Id.,* at US3089.)

**\*19** Frederick Maurin, an Area Director responsible for the New Jersey Field Offices and the selecting official,

states that he chose Dean Frenkian because of his leadership, program knowledge and field office management experience. (*See* Maurin Decl., at ¶¶ 2, 5.) Mr. Frenkian had served as Assistant District Manager of the Paterson District Office for more than two years, and Mr. Maurin explains that he thus considered him to be immediately capable of leading the office. (*Id.,* at ¶ 5.) Prior to that position, Mr. Frenkian had worked in the "Area" as a Project Manager for the Field Disability and Disability Claims Manager Projects, and had volunteered for a difficult four-month assignment as Temporary District Manager in the Trenton Field Office. (*Id.*) According to Mr. Maurin, Mr. Frenkian was one of the best District Management personnel that he had supervised in his 15 years as Area Director. (*Id.,* at ¶ 6.)

Mr. Maurin states that he did not select Plaintiff, or a GS–14 Director also on the Best Qualified List, because neither had recent field office management experience. (*Id.,* at ¶ 7.) Plaintiff maintains that he was equally as qualified as Mr. Frenkian, based on Plaintiff's years of experience in both the field office and the Regional Office. (*See* Milano Dep., at p. 318, ll. 8–21.)

Although he does not provide Mr. Frenkian's age at the time he was selected, Plaintiff states that Mr. Frenkian was significantly younger than he. (*See* Milano Decl., at 26.)

### 17. Selection of Norma Lefebvre (Vacancy Announcement ROII 199–04NY)

On August 18, 2004, the SSA posted Vacancy Announcement ROII 199–04NY for the position of Social Insurance Specialist (Project Manager), a temporary position, not to exceed two years. (*See* Def. Rule 56.1 Stmt., at ¶ 38; Infiesta Decl., Ex. D (Vacancy Announcement), at US02346.) This Program Manager would act as the Regional Project Manager in the Center for Disability, would supervise the implementation of a new paperless method for processing disability claims, and would act as the primary liaison between the Regional and Central Offices and the State DDSs. (*See* Infiesta Decl., at ¶ 26, Ex. D, at US02346.) Applicants were evaluated based on, *inter alia,* their knowledge of Social Security and disability programs, their ability to plan and organize the work of others in a leadership capacity, and their analytical and communication skills. (*Id.,* Ex. D, at US02349–54.)

Mr. Infiesta, the selecting official, states that he chose Norma Lefebvre because of her leadership and communication skills,

which were evidenced by her sensitivity in dealing with people outside the agency, her selection for SSA's Advanced Leadership Program, a highly competitive national program, and her selection for the Brookings Institute Legislative Fellow Program. (*See* Infiesta Decl., at ¶¶ 28–30.) Ms. Lefebvre had served as Assistant Director of the Center for Material Resources and also had been a long-time GS–13 Field Office Manager. (*Id.,* at ¶¶ 29–30.) Although Mr. Infiesta states that he recognized Plaintiff's experience in the Disability Center working with State DDSs, he felt that Ms. Lefebvre's leadership background was superior. (*Id.,* at ¶ 31.)

**\*20** Plaintiff claims that his educational background and specialized disability experience greatly exceeded that of Ms. Lefebvre. (Milano Decl., at 27.) According to Plaintiff, Ms. Lefebvre did not graduate from college. (*Id.*) In detailing his experience, Plaintiff also notes that he attended and was involved with conferences held by the Disability Center for the Work Incentive Network, and that Ms. Lefebvre was not invited to attend. (*Id.*) Moreover, Plaintiff points out that, while Ms. Lefebvre had not served in the Disability Center or dealt with high-level DDS officials, he had over 20 years of experience at the Disability Center and had experience dealing with such high-level officials. (*Id.,* at 26–27.)

According to Plaintiff, Ms. Lefebvre was 52 at the time of her selection, and Plaintiff was 63. (*Id.,* at 27.)

### 18. Selection of Mary Carroll (Vacancy Announcement ROII 057–05NY)

On December 20, 2005, the SSA posted Vacancy Announcement ROII 057–05NY for the position of Supervisory Management Analyst. (*See* Def. Rule 56.1 Stmt., at ¶ 40; Infiesta Decl., Ex. E (Vacancy Announcement), at US02409.) The Supervisory Management Analyst would act as the CSI Director and would supervise and guide the staff responsible for the evaluation, implementation and management of systems security, program and administrative integrity, and fraud prevention and detection. (*See* Infiesta Decl, Ex. E, at US02409.) According to Mr. Infiesta, the CSI Director would also be responsible for dealing with the SSA's Office of Inspector General and high-level Regional and Central Office officials. (*Id.,* at ¶ 35.) Applicants were evaluated based on their knowledge of programmatic, administrative, and security and integrity procedures, in addition to their supervision, negotiation, communication, and analytic abilities. (*Id.,* Ex. E, at US02412–15.)

Mr. Infiesta, the selecting official, states that he chose Mary Carroll because her communication skills, judgment, and leadership skills were superior to the other candidates, and because she had extensive experience with security issues from her work managing the Hunts Point Field Office and serving a 120–day detail as Acting Director of Human Resources. (Infiesta Decl., at ¶¶ 36–37.) Additionally, he states that Ms. Carroll had ably represented the SSA in labor arbitration cases, which demonstrated the confidence the SSA had in her judgment and communication skills. (Id., at ¶ 36.) Mr. Infiesta explains that, while he recognized Plaintif3f's experience as a Team Leader in the CSI, he had concerns about Plaintiff's ability to manage the Center, based on his familiarity with Plaintiff's performance as his second-line supervisor. (Id., at ¶ 37.)

Plaintiff characterizes Mr. Infiesta's assessment of his supposed inability to manage the CSI as "vague," and claims that, in fact, he was more experienced and more qualified than Ms. Carroll for the position. (See Milano Decl., at 28–29.) According to Plaintiff, while Ms. Carroll had not worked at the CSI, and there was no documentation to support her specialized experience with security issues, he had five years of specialized experience as Team Leader at the CSI and approximately 25 more years of experience at the Regional Office. (Id.) Further, Plaintiff claims that, similar to Ms. Carroll, he had experience meeting with top Regional officials and dealing with labor arbitration cases when he was a union representative. (Id.)

**\*21**  According to Plaintiff, Ms. Carroll was 52 at the time of her selection, and he was 63. (Id.)

### 19. Selection of Raymond Egan (Vacancy Announcement ROII 213–05NY)

On August 4, 2005, the SSA posted Vacancy Announcement ROII 213–05NY for the position of DPA for the New York DDS. (See Def. Rule 56.1 Stmt., at ¶ 42; Infiesta Decl., Ex. F (Vacancy Announcement), at US02552.) The DPA's duties would include ensuring that the New York DDS performed in a satisfactory manner and complied with federal regulations. (See Infiesta Decl. Ex. F, at US02552.) The DPA would also be responsible for interpreting the national budget, evaluating and approving budget requests, advising state officials, and reviewing fiscal audit reports of disability operations. (Id.)

Mr. Infiesta, the selecting official, purports to have chosen Raymond Egan because he had distinguished himself in

difficult situations, evidencing the leadership skills necessary to succeed as DPA. (See Infiesta Decl., at ¶ 41.) Prior to his selection, Mr. Egan had been temporarily assigned as manager of the Midtown Field Office, where, according to Mr. Infiesta, he "succeeded in showing significant operational improvement during his tenure." (Id.) Additionally, Mr. Infiesta asserts that Mr. Egan did "an outstanding job" when he was assigned to clean up a severely backlogged Patchogue Field Office, and that Mr. Egan had experience dealing with the New York DDS management and staff in a prior position as Area Administrative Assistant. (Id.)

Mr. Infiesta also states that, because the New York DDS had a unique computer system and was in the process of automating the SSA's disability claims, he needed someone with a computer systems background for the position. (Id., at ¶ 42.) During Mr. Infiesta's temporary assignment as Area Director, Mr. Egan was the Area Systems Coordinator, where he was responsible for computer system issues in the field offices within the "Area." (Id.) Thus, Mr. Infiesta asserts, he believed that Mr. Egan had the necessary computer background to address the systems issues unique to the New York DDS. (Id.) With respect to Plaintiff, Mr. Infiesta states that he had concerns about Plaintiffs lack of organization and the fact that he required close supervision to manage the members of his team. (Id., at ¶ 43.)

Plaintiff contends that he was more qualified for the position than Mr. Egan because, unlike Mr. Egan, he had specialized experience in the Disability Center and the Regional Office. (See Milano Dep., at p. 348, ll. 7–9; Milano Decl., at 30.) Indeed, Plaintiff maintains that Mr. Infiesta's failure to disqualify Mr. Egan for lack of Regional Office experience undermines the position of SSA officials who, in other instances, cite Plaintiff's lack of recent field office experience as a reason for not having selected him for field office manager positions. (See Milano Decl., at 30.) In detailing his own qualifications, Plaintiff notes that he attended and was involved with conferences held by the Disability Center for the Work Incentive Network, and that Mr. Egan was not invited to attend. (Id.) Additionally, Plaintiff asserts that Mr. Egan's computer background was "not that unique," as the New York Region had five or six "Areas," each with a number of Area Systems Coordinators. (Id., at 29–30.) According to Plaintiff, not only did the Vacancy Announcement fail to mention that a computer background was needed for this position, but no DPA in the past 25 years, including two current DPA's in other offices also in the process of automating their disability claims, had a "computer systems

background." (*Id.,* at 30.) Moreover, Plaintiff points out that there is no documentation to support Mr. Infiesta's negative assessment of Plaintiff s abilities, nor is there documentation to support Mr. Infiesta's statement that Mr. Egan had regular contact with the New York DDS management and staff. (*Id.,* at 29–30.) Finally, Plaintiff maintains that any feedback that Mr. Infiesta allegedly received from others should be disregarded as "hearsay." (*Id.*)

### 20. Selection of Marie Martinez–Wolcott (Vacancy Announcement ROII 049–06NY)

*\*22* On December 7, 2005, the SSA posted Vacancy Announcement ROII 049–06NY for the position of Disability Program Administrator for the New Jersey DDS. (*See* Def. Rule 56.1 Stmt., at ¶ 44; Infiesta Decl., Ex. G (Vacancy Announcement), at US02687.) The description of this position was the same as that for DPA for the New York DDS. (*See supra,* at Point C(19).)

Mr. Infiesta, the selecting official, states that he chose Marie Martinez–Wolcott because of her "outstanding communication and analytical skills." (Infiesta Decl., at ¶ 47.) Ms. Martinez–Wolcott had been selected to provide a briefing to the Commissioner of Social Security, which, according to Mr. Infiesta, demonstrated the confidence of SSA's top management in her abilities. (*Id.*) Mr. Infiesta also notes that Ms. Martinez–Wolcott had experience making numerous public presentations on Social Security issues and medical policies. (*Id.*) In addition, Mr. Infiesta purports to have chosen Ms. Martinez–Wolcott because of her medical policy expertise, which was relevant, according to Mr. Infiesta, because the New Jersey DDS had traditionally been a poor performer in processing disability claims. (*Id.,* at ¶ 48.) According to Mr. Infiesta, he did not select Plaintiff for the position because Plaintiff did not manage his team effectively and required close supervision in order to meet deadlines. (*Id.,* at ¶ 49.)

Plaintiff contends that he was more experienced and more qualified than Ms. Martinez–Wolcott, based on the fact that he had more years of service at the SSA, at the GS–13 level, at the Regional Office, and at the Disability Center. (*See* Milano Decl ., at 30–31.) Further, Plaintiff asserts that Ms. Martinez–Wolcott did not have experience as a Team Leader or a supervisor. (*Id.,* at 31.) In noting his experience, Plaintiff points out that he attended and was involved with conferences held by the Disability Center for the Work Incentive Network, and that Ms. Martinez–Wolcott was not invited to attend. (*Id.*)

Additionally, Plaintiff states that "medical policy expertise" was not necessary for this position, as it was not included in the Vacancy Announcement, and as most past and present DPAs did not have this expertise. (*Id.*) Plaintiff also points out, once again, that the SSA has come forward with no documentation to support Mr. Infiesta's supposedly negative assessment of Plaintiff s abilities, and that any feedback that Mr. Infiesta allegedly received from others is inadmissible "hearsay." (*Id.*)

According to Plaintiff, Ms. Martinez–Wolcott was 50 at the time of her selection, and Plaintiff was 65. (*Id.,* at 32.)

### 21. Extension of Robert Sayre's 120 Day Non–Competitive Detail

On November 2, 2003, then-Acting-Area-Director Julio Infiesta granted the CSI Team Leader, Robert Sayre, a 120–day non-competitive detail as Director of the CSI, a GS–14 position, because the permanent Director, Irene Corva, had been placed on a 120–day detail in another office.[24] (*See* Def. Rule 56.1 Stmt., at ¶ 35; Infiesta Decl., at ¶¶ 18, 21.) Before the 120 days expired, however, Ms. Corva left her position as CSI Director to participate in an 18–month SSA leadership program. (*See* Infiesta Decl., at ¶ 21.) According to Mr. Infiesta, he then asked Mr. Sayre to remain as Acting Director until a new director could be chosen, although he also advised Mr. Sayre that he would have to return to his former GS–13 pay level, once the original 120–day detail ended. (*Id.,* at ¶¶ 21–22.) Mr. Sayre agreed and served as Acting Director until April 26, 2004, when the new Director, Dennis Mass, began. (*Id.,* at ¶ 22.) Plaintiff claims that the approximately 60–day extension of the 120–day period when Mr. Sayre was originally supposed to serve as Acting Director constituted a violation of MOPP. (*See* Milano Decl., at 26.) Further, Plaintiff states that Mr. Infiesta extended Mr. Sayre's detail "solely to deprive [plaintiff] of the opportunity to serve in a temporary high graded position in the [CSI]." (*Id.*)

24    In section 4.2.5 of MOPP, the SSA has adopted the Office of Personnel Management regulation, 5 C.F.R. § 335.103(c)(3)(iii), which allows federal agencies the discretion to give an employee a temporary promotion or detail to a higher graded position for up to 120 days. (*See* Infiesta Decl., Ex. C (MOPP).)

### 22. Plaintiff's Reassignment in the CSI from Team Leader to Program Expert

**\*23** On August 17, 2006, Plaintiff's supervisor and the Director of the CSI, Mary Carroll, informed Plaintiff that he would be reassigned from the CSI Team Leader position. (*See* Declaration of Mary Carroll, dated Oct. 10, 2007 ("Carroll Decl.") (Dkt.48.), at ¶ 4.) On August 23, 2006, Plaintiff was reassigned to the position of Program Expert in the Center for Disability, at the same GS–13 pay level. (*Id.*) According to Ms. Carroll, after a discussion with her supervisor, Mr. Infiesta, they decided to reassign Plaintiff because "he was not demonstrating the high degree of organization, initiative, and assignment-control that is required of a Team Leader." (*Id.,* at ¶ 5.) Ms. Carroll contends that she received many inquiries from SSA executives asking about assignments that had either been sent directly to Plaintiff or given to him by Ms. Carroll to be performed by a member of his team. (*Id.,* at ¶ 6.) According to Ms. Carroll, when she asked Plaintiff about the status of these assignments, he was often unable to provide her with status updates because he had failed to keep any record of being assigned the matters. (*Id.*) Ms. Carroll states that, when Plaintiff eventually provided her with the information, she would learn that he had never assigned the matters to anyone or, if he had, he had not established controls to ensure the assignments' timely completion. (*Id.*)

Ms. Carroll maintains that she spoke to Plaintiff several times about his "lack of control over the workloads, his poor organizational skills, and the messiness of his desk, which contributed to his lack of organization." (*Id.,* at ¶ 7.) According to Ms. Carroll, she spent a great deal of time following up on many of Plaintiff's assignments and often had to deal directly with the members of his team to ensure that the work was successfully completed. (*Id.*) Ms. Carroll states that, while supervising Plaintiff, she saw "little or no improvement" in his organization or control over assignments. (*Id.*) Furthermore, Ms. Carroll contends that, during her conversations with Plaintiff, she not only discussed his strengths, but also expressed her concerns about his lack of organization and lack of control over the matters assigned to his team. (*Id.,* at ¶ 8; Exs. A–E (Ms. Carroll's handwritten meeting notes).)

Plaintiff disputes Ms. Carroll's statements that he did not control matters assigned to his team or keep any record of assignments, refering to such assertions as "fabricated." (*See* Milano Decl., at 32.) Plaintiff contends that, while he may not have had an answer regarding the status of a matter immediately, as most cases were assigned and worked on electronically, he would search the electronic files and provide Ms. Carroll with an update. (*Id.*) Plaintiff also asserts that Ms. Carroll has provided no documentation of his supposedly poor performance, the inquiries from SSA executives, or the several "follow-ups" that Ms. Carroll claims to have needed. (*Id.,* at 34.) Instead, Plaintiff asserts that none of his prior Directors at the CSI had informed him about problems with his performance and that he had received several awards during his time at the CSI. (*Id.,* at 32.) Plaintiff also notes that, when Ms. Carroll completed his October 4, 2006 performance assessment form, she checked the box rating his performance at the "Successful Level," as opposed to rating it at the "Unacceptable Level." (*Id.;* Pl. Mem., Ex. Q (Performance Assessment for Non–Supervisory Employees).)

**\*24** Moreover, Plaintiff contends that he was never told that he might be reassigned because of issues with his performance and that, although Ms. Carroll did speak to him numerous times about his desk, she never spoke with him in depth regarding these performance issues. (*Id.,* at 32, 33.) Plaintiff also suggests that Ms. Carroll's notes of her meetings with Plaintiff are inadequate to demonstrate what was actually discussed, as the notes were never previously shown to Plaintiff and do not contain his signature. (*Id.,* at 33.)

### *DISCUSSION*

### I. *APPLICABLE LEGAL STANDARDS*

#### A. *Rule 56*

Under Rule 56(c), a motion for summary judgment may be granted when the parties' sworn submissions show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996). The moving party bears the burden of showing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). Accordingly, the Court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.,* 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

Nonetheless, opposition to summary judgment "may not rest upon the mere allegations or denials of the adverse

party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). This means that "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation," *Scott v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)), but, rather, must present "significant probative evidence tending to support the complaint." *Smith v. Menifee,* 00 Civ. 2521(DC), 2002 U.S. Dist. LEXIS 4943, at * 9 (S.D.N.Y. Mar. 25, 2002) (citing *First Nat'l Bank of Ariz. v. Cities Servs. Co.,* 391 U.S. 253, 290 (1968). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986) (citations omitted).

Where the party opposing summary judgment is proceeding on a *pro se* basis, the Court must read that party's papers liberally and interpret them "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks and citation omitted). Even a *pro se* plaintiff, however, cannot defeat a motion for summary judgment by relying merely on the allegations of a complaint. *See Champion v. Artuz,* 76 F.3d 483, 485 (2d Cir.1996). Rather, when confronted with evidence of facts that would support summary judgment, the plaintiff must come forward with evidence in admissible form that is capable of refuting those facts. *See* Fed.R.Civ.P. 56(e); *see also Jermosen v. Coughlin,* 877 F.Supp. 864, 867 (S.D.N.Y.1999) (*pro se* plaintiffs must present concrete evidence from which a reasonable jury could return a verdict in their favor in order to defeat summary judgment).

**\*25** In sum, the Court "cannot try issues of fact; it can only determine whether there are issues to be tried" on the evidence presented. *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir.1967); *accord Sutera v. Schering Corp.,* 73 F.3d 13, 15–16 (2d Cir.1995). Where there is no genuine issue of material fact, viewing the evidence in the light most favorable to the nonmoving party, summary judgment is appropriate. *See Liberty Lobby,* 477 U.S. at 248.

**B. *Local Civil Rule 56.1***
Under this Court's rules, a party moving for summary judgment under Rule 56 must submit "a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). If the opposing party fails to respond to the moving party's Rule 56.1 statement, then the

material facts contained in the moving party's statement are deemed admitted as a matter of law. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *see also* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). If the moving party seeks summary judgment against a *pro se* litigant, the moving party is also required to notify the *pro se* litigant of the requirements of Rule 56 and Local Rule 56 .1, in the specific form prescribed by this Court's rules. Local Civ. R. 56.2. *Pro se* litigants are then not excused from meeting the requirements of Local Rule 56.1, *see Vt. Teddy Bear Co., Inc. v. 1–800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004) (upholding Local Rules 56.1 and 56.2), although, where a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions, *see Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001); *see also Johnson v. New York,* 04–CV– 1070 (DLI)(LB), 2007 U.S. Dist. LEXIS 17212, at \*18–\*19 (E.D.N.Y. Mar. 9, 2007).

"The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing the district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz,* 258 F.3d at 74. Local Rule 56.1, however, does not relieve the party seeking summary judgment of the burden of establishing that it is entitled to judgment as a matter of law. *Id.* Thus, the Court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement; it also must be satisfied that the moving party's assertions are supported by the record. *See Vt. Teddy Bear Co., Inc.,* 373 F.3d at 244; *see also Holtz,* 258 F.3d at 74; *Zerafa v. Montefiore Hosp. Hous. Co.,* 403 F.Supp.2d 320, 329 n .12 (S.D.N.Y.2005). Summary judgment may only be granted where the Court is satisfied that the undisputed facts, as supported by the record, " 'show that the moving party is entitled to a judgment as a matter of law.' " *Champion,* 76 F.3d at 486 (quoting Fed.R.Civ.P. 56(c)).

**C. *McDonnell Douglas Burden–Shifting Scheme***
**\*26** The ADEA provides that it shall be unlawful for an employer to "discriminate against any individual ... because of such individual's age." 29 U.S.C. §§ 623(a)(1); *see*

*D'Cunha v. Genovese/Eckerd Corp.,* 479 F.3d 193, 194–95 (2d Cir.2007). The ADEA also prohibits an employer from retaliating against an employee for complaining of employment discrimination on the basis of age. 29 U.S.C. §§ 623(d). Second Circuit law dictates that the burden and allocation of proof governing claims of discrimination and retaliation under the ADEA mirror those of cases brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). *See, e.g., D'Cunha,* 479 F.3d at 194–95; *Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003). Accordingly, claims under the ADEA follow the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).

Under *McDonnell Douglas* and *Burdine,* the plaintiff must first establish a *prima facie* case of discrimination or retaliation. To establish a *prima facie* case of age discrimination, the plaintiff must show that: (1) he was a member of the protected class (*i.e.,* at least 40 years old); (2) he was qualified for the job in question; (3) the employer took an adverse employment action against him; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000). Similarly, to establish a *prima facie* case of retaliation, the plaintiff must demonstrate that: (1) he opposed an allegedly discriminatory practice under the ADEA; (2) the employer was aware of this activity; (3) the employer took an adverse action against the plaintiff; and (4) a "causal connection exists between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part in the adverse employment action." *Kessler v. Westchester Dep 't. of Soc. Servs.,* 461 F.3d 199, 205–06 (2d Cir.2006).

If the plaintiff makes this *"de minimus"* showing, *see Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 94 (2d Cir.2001), a presumption of discrimination is created and the burden then shifts to the employer merely to articulate some legitimate, non-discriminatory or non-retaliatory reason for the adverse action taken against the plaintiff. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142–43 (2000); *see also Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000). The employer need not persuade the court that the proffered reason was the actual reason for the adverse action; rather, the employer's burden is simply to rebut the plaintiff's *prima facie* case by clearly setting forth, "through the introduction of admissible evidence, the reasons for the [adverse action against the plaintiff] ." *Burdine,* 450 U.S. at 254–55.

**\*27** If the employer articulates such a reason, the presumption of discrimination disappears, *see St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510 (1993), and the burden then shifts to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for age discrimination or retaliation, *see Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2000). Thus, once the defendant has presented a non-discriminatory or non-retaliatory reason for its employment action, it is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination [or retaliation]." *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000). The ultimate burden of proving that the defendant was intentionally discriminatory or retaliatory in its employment practices remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253.

A reason given by an employer for its action cannot be proven to be pretextual unless the plaintiff shows that the reason was false *and* that discrimination or retaliation was "the real reason." *St. Mary's Honor Ctr.,* 509 U.S. at 515. At the summary judgment phase, the plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false *and* as to whether it is more likely that a discriminatory [or retaliatory] reason motivated the employer to make the adverse decision." *Gallo v. Prudential Residential Servs., Ltd.,* 22 F.3d 1219, 1225 (2d Cir.1994); *see also Burdine,* 450 U.S. at 256 (noting that plaintiff can meet his/her burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence"). Accordingly, the ultimate question on a summary judgment motion in a discrimination or retaliation case is whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination or retaliation occurred. *Finney v. Planned Parenthood of New York City, Inc.,* No 02 Civ. 7942(CMB), 2003 WL 22928730, at *4 (S.D.N.Y. Dec. 10, 2003) (citing *McGuinness v. Lincoln Hall,* 263 F.3d 49, 55 (2d Cir.2001)).

The Court notes that an extra measure of caution is needed in awarding summary judgment to a defendant where, as in a discrimination case, intent is at issue. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994). An employer's records will rarely document the state of mind

or motives of its decision-makers, and therefore materials "must be carefully scrutinized" for circumstantial evidence about the employer's state of mind and those factors that motivated the challenged action. *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997); *see Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("[T]he salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.").

## II. *PLAINTIFF'S CLAIMS*

### A. Failure To Promote Claims

**\*28** During the period from 1997 through 2005, Plaintiff sought promotion by applying 20 times for available GS–14 level positions. Despite the fact that Plaintiff made the Best Qualified List for each of these positions, he was not selected for any of them. Plaintiff claims that each instance of his "non-selection" was based on age discrimination and/or retaliation by the SSA for his complaints of age discrimination.

Although Plaintiff does not identify direct evidence to support his claims, he argues that a jury could find in his favor based on circumstantial evidence. In particular, as set out above, Plaintiff stresses that he was well-qualified for each position, and he suggests that his repeated non-selection shows that the SSA engaged in a pattern of giving preferential treatment to younger individuals. None of Plaintiff's failure-to-promote claims, however, can withstand close scrutiny at this summary judgment stage. As discussed below, one of Plaintiff's claims is time-barred, and, as to the others, none of the evidence proffered by Plaintiff is sufficient to raise a triable issue of fact.

### 1. Plaintiff's First Claim, Challenging the Selection of Jane Zanca, Is Time–Barred.

Plaintiff first claims that he was discriminated against when he was not selected for the DPA position posted in 1997 (in Vacancy Announcement ROII 406–97R), which instead went to Jane Zanca. The SSA argues that this claim is time-

barred, in that Plaintiff failed to raise the claim with an EEO counselor within 45 days of the adverse employment action. (Def. Mem., at 26; Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, dated Mar. 12, 2008 ("Def. Reply Mem.") (Dkt.62), at 1–2.)

Under the ADEA, a litigant must exhaust all administrative remedies in a timely fashion prior to commencing an action in federal court. *See Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996); *see also Wrenn v. Secretary, Dept. of Veteran Affairs,* 918 F.2d 1073, 1078 (2d Cir.1990). A litigant who is a federal employee must initiate contact with an EEO counselor within 45 days of the purportedly discriminatory act or the effective date of the challenged personnel action. *See* 29 C.F.R § 1641.105(a)(1). Failure to contact an EEO counselor within 45 days and, thus, to exhaust all administrative remedies in a timely manner, provides a basis for dismissal of a plaintiff's lawsuit, *see, e.g., Judge v. Henderson,* 172 F.Supp.2d 410, 412 (S.D.N.Y.2001), although the 45–day time limit is subject to waiver and equitable tolling, *see Terry v. Ashcroft,* 336 F.3d 128, 150 (2d Cir.2003) (internal citations omitted).

The effective date of Ms. Zanca's selection for the DPA position was March 1, 1998. (*See* Marinaro Decl., Ex. I, at US00234.) To fall within the 45–day time period, Plaintiff needed to have contacted an EEO counselor regarding this incident by April 15, 1998. It is undisputed, however, that Plaintiff did not contact an EEO counselor about Ms. Zanca's selection until November 20, 1998, well beyond the 45–day deadline. (*See* Milano Dep., at p. 111, ll. 8–11.) Plaintiff argues that, in this instance, his obligation to meet the 45–day time limit should be deemed waived, as, in his view, his claim regarding Ms. Zanca's selection is "reasonably related" to his other claims. (*See* Pl. Mem., at 15.)

**\*29** Courts in this circuit have "recognized three situations in which claims [under the ADEA] not raised in an EEO charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action": (1) where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"; (2) where the complaint alleges retaliation by an employer against an employee for filling a charge with the EEOC; and (3) where the complaint "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry,* 336 F.3d at 151

(citing *Butts v. New York Dep't of Housing Preservation and Dev.,* 990 F.2d 1397, 1402–03 (2d Cir.1993) (superceded on other grounds) (internal quotations omitted).

Plaintiff, however, has not presented sufficient evidence that his claim falls into any of these three categories, so as to qualify as "reasonably related" to allegations he timely raised before the EEOC. The first category appears to contemplate a situation in which a complainant mistakenly omits a particular claim from a timely-filed EEOC charge. *See Butts,* 990 F.2d at 1402 (noting that since EEOC charges often are filled out by employees without counsel, courts have recognized "an allowance of loose pleading," which allows claims left out of the charge still to be brought). Here, Plaintiff did not omit his claim regarding the selection of Ms. Zanca from a charge that was filed within 45 days of that particular incident; rather, Plaintiff first filed a complaint with the EEOC approximately seven months beyond the 45–day time limit for the claim regarding the selection of Ms. Zanca. Nor does Plaintiff's claim fall into the second category: as Plaintiff's EEO activity began after the selection of Ms. Zanca, he cannot and does not allege that the SSA did not select him for this position in retaliation for his EEO activity. Finally, Plaintiff's claim does not fall into the third category, which contemplates "further" instances of discrimination arising after a timely-filed EEOC charge. On the contrary, Plaintiff's claim regarding Ms. Zanca's selection arose *prior* to the other incidents of alleged discrimination that formed the basis of his complaints to the EEOC. Simply put, events occurring before November 20, 1998, the first time Plaintiff contacted an EEO counselor, cannot qualify as "further" incidents of discrimination. *See Nakis v. Potter,* No. 01 Civ. 10047(HBP), 2004 U.S. Dist. LEXIS 25250, at *41 (S.D.N.Y. Dec. 15, 2004) (finding that "further" acts of discrimination must be limited to acts *subsequent* to the EEOC complaint) (emphasis added).

Plaintiff also contends that the 45–day time period should not be found to have commenced until after Plaintiff determined that age was a factor in the SSA's failure to select him for the position at issue. (*See* Pl. Mem., at 15.) Plaintiff argues that he falls within 29 C.F.R. 1614.105(a)(2), which states, in relevant part, that the 45–day time limit shall be extended when an individual shows that he "did not know and reasonably should not have known that the discriminatory matter or personnel action occurred." Yet even if Plaintiff did not believe that the SSA's failure to select him for the DPA position was discriminatory until November 1998, his claim would still be untimely. His time period for contacting an EEO counselor began to run when he learned that Ms.

Zanca was selected instead of him, not when he learned of information that led him to believe that this adverse action was discriminatory. *See Fausto v. Reno,* 955 F.Supp. 286, 293 (S.D.N.Y.1997); *see also Giordano v. Potter,* No. 03 Civ. 0698, 2004 U.S. Dist. LEXIS 187, at *3–4 (N.D.N.Y. Jan. 9, 2004) (finding that a discrimination claim does not accrue when employee obtains information that leads her to believe that a prior adverse employment action was unlawful, but when she is aware of the actual adverse employment action).

**\*30** In sum, Plaintiff has failed to demonstrate the existence of a triable issue as to whether he raised his claim regarding Ms. Zanca's selection with an EEO counselor within 45 days of the selection or that an exception to the timely exhaustion requirement is applicable here. [25] Accordingly, I recommend that the SSA's motion for summary judgment be granted as to this claim.

25     The SSA argues that Plaintiff may not rely upon the "continuing violation" doctrine, under which, "if a Title VII [or ADEA] Plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993). Plaintiff does not appear to invoke this doctrine. In any event, the doctrine would not apply here, given that a "failure to promote" is considered a discrete discriminatory act. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002) (holding that the ADEA does not allow for recovery of discrete acts of discrimination or retaliation that did not occur within the statutory time period, and that "discrete acts" include the "failure to promote").

### 2. *Plaintiff Lacks Sufficient Evidence To Support His Claims.*

Even apart from the time-bar, Plaintiff's claim regarding Ms. Zanca's selection—and, indeed, each of Plaintiff's failure-to-promote claims—are subject to dismissal because Plaintiff has not come forward with evidence from which a rational trier of fact could find that he was not selected for reasons that were discriminatory or retaliatory. The SSA apparently does not dispute that Plaintiff has made out a *prima facie* case of age discrimination with respect to each instance of non-selection, and retaliation with respect to all but the first two. Rather, the SSA argues that it has provided legitimate, non-discriminatory and non-retaliatory reasons for selecting an individual other than Plaintiff for each of the positions in question, and that Plaintiff has not met his burden of

presenting evidence sufficient for a jury to find that the SSA's proffered reasons are a pretext for discrimination or retaliation.

### a. The SSA's Proffered Reasons

The SSA has articulated legitimate, non-discriminatory and non-retaliatory reasons for choosing applicants other than Plaintiff for the 20 positions in questions. While the SSA offers multiple bases for each of its 20 selections, its reasons generally fall into certain categories. (See Def. Mem., at 31.) First, the SSA asserts that, at the time the vacancies were announced, several of the employees selected either were already serving in the relevant positions (Ms. Freeburn, Mr. McDevitt, Ms. Mullarkey, and Mr. Heyniger) or were heavily involved in the particular project (Mr. Anderson and Ms. Skrupskis). (Id.) Second, the SSA states that other selected employees, such as Ms. Corva, Ms. Muir, Mr. Solow, Mr. Ryan, and Mr. Egan, had particular expertise in areas such as human resources or security, which was desirable for the positions in question and made these candidates stand out among the applicants. (See id.) Third, according to the SSA, several applicants (Ms. Zanca, Mr. Dooley, Mr. Frenkian, Ms. Lefebvre, Ms. Carroll, Mr. Egan, and Ms. Martinez–Wolcott) were selected because their backgrounds demonstrated high-level skills that the selecting officials were seeking, such as leadership, negotiation, or communication skills. (See id.) Fourth, the SSA proffers that certain applicants were selected as a result of an impressive interview performance (Ms. Bostick–Borden), recent field office and managerial experience (Mr. Heyniger's initial selection, Mr. Frenkian), or strong recommendations of supervisors (Ms. Zanca, Ms. Bostick–Borden, and Mr. Anderson). (See id., at 31–32.) Finally, the SSA notes that selecting officials had concerns about Plaintiff's ability to handle effectively the responsibilities of certain positions. (See, e.g., Def. Mem., at 22, 24; Infiesta Decl., at ¶¶ 37, 43.)

*31   The defendant's burden of articulating a non-discriminatory and non-retaliatory reason is not a demanding burden. See Bicker staff v. Vasser College, 196 F.3d 435, 446 (2d Cir.1999) (stating that defendant's burden of production is "not a demanding one," as it need only offer a non-discriminatory explanation to rebut plaintiff's prima facie case ). The defendant "need not persuade the court that it was actually motivated by the proffered reasons." Deravin v. Kerik, No. 00 Civ. 7487(KMW)(KNF), 2007 U.S. Dist. LEXIS 24696, at * 21 (S.D.N.Y. Apr. 2, 2007) (internal quotation and citation omitted); see also Burdine, 450 U.S. at

253 (noting that the burden of persuasion remains at all times with plaintiff).

Here, the reasons proffered by the SSA for each selection at issue satisfy its burden. See Chambers–English v. Unisys Corp., No. 05 Civ. 2976, (DC), 2007 WL 486681, at * 1 (S.D.N.Y. Feb. 14, 2007) (employer satisfied its burden by proffering that selected employee had already been working in the position at issue for two years); Mauro v. Southern New England Telecommunications, Inc., 208 F.3d 384, 387–88 (2d Cir.2000) (the stated reason that selected employee had expertise necessary for position at issue constituted legitimate, non-discriminatory reason for selection); Perez v. Consolidated Edison Corp. of New York, No. 02 Civ. 2832(PKC) (FM), 2006 U.S. Dist. LEXIS 67459, at *25–26 (S.D.N.Y. Sept. 20, 2006) (the proffered reason that selected applicant's communication, leadership and managerial abilities were the reasons for selection satisfied the employer's burden); Alvarez v. Nicholson, No. 03 Civ. 4173(RCC), 2005 U.S. Dist. LEXIS 45744, at * 14–15 (S.D.N.Y. Aug. 3, 2005) (employer satisfied its burden by proffering that selected employee's performance at an interview was better than that of plaintiff); Williams v. State of New York Office of Court Admin ., No. 80 Civ. 4717(CSH), 1988 WL 18831, at * 4 (S.D.N.Y. Feb. 19, 1988) (recommendation from supervisor or lack of such a recommendation constitutes legitimate, non-discriminatory reason to meet employer's burden).

### b. Plaintiff's Evidence of Pretext

As the SSA has articulated legitimate non-discriminatory and non-retaliatory reasons as to why applicants other than Plaintiff were selected for the positions at issue, the burden shifts back to Plaintiff to offer evidence which creates a triable issue of fact as to whether the reasons offered by the SSA are a pretext for age discrimination or retaliation. See Reeves, 530 U.S. at 143. At the summary judgment phase, Plaintiff can demonstrate pretext either with direct evidence of discrimination or retaliation or with indirect or circumstantial evidence. See Burdine, 450 U.S. at 256. While Plaintiff admits that none of the selecting officials or relevant decision-makers ever commented on his age or EEO activity or told him that either played a role in their selection decisions (see, e.g., Milano Dep., at p. 115, ll. 21–25, p. 116, ll. 2–25, p. 120, ll. 11–25), Plaintiff presents numerous arguments in an attempt to demonstrate that the reasons proffered by the SSA are pretextual and that each failure to select him was based on his age and/or was in retaliation for his EEO activity. Plaintiff's various arguments may be summarized as

follows: (1) that each selected applicant was younger than he; (2) that he was either equally or more qualified than the selected applicants due to his experience at the SSA; (3) that the criteria used to select candidates was subjective; (4) that certain candidates chosen were "pre-selected"; (5) that the SSA's reliance on recommendations from applicants' supervisors should be disregarded as hearsay; (6) that the court should draw adverse inferences regarding the SSA's failure to provide two documents; and (7) that there was a "general trend" of Plaintiff s being passed over for younger candidates. On the evidentiary record presented, however, none of these arguments are ultimately persuasive.

### i. *Age of Selected Candidates*

**\*32**  To the extent that Plaintiff attempts to argue that the mere fact that he was older than any of the selected applicants is sufficient to demonstrate pretext (*see, e.g.,* Milano Decl., at 7, 9, 12 (stating each time that the selected applicant was younger than he at the time of his or her selection)) [26], Plaintiff's argument is inadequate. While the fact that each applicant was younger than he at the time of selection is sufficient to sustain Plaintiff's *de minimis* burden of establishing a *prima facie* case, it is not sufficient to undermine the SSA's asserted non-discriminatory and non-retaliatory reasons for its selection of applicants other than Plaintiff. *See Abdu–Brisson v. Delta Airlines, Inc.,* 239 F .3d 456, 467 (2d Cir.2001); *see also Richnane v. Fairport Central School Dist.,* 179 F.Supp.2d 81, 81 (W.D.N.Y.2001); *Coleman v. Prudential Relocation,* 975 F.Supp. 234, 247 (W.D.N.Y.1997) ("losing out to a younger candidate, without more, is insufficient to show pretext") (citation omitted).

26     *See supra,* at Point C(l) and n.12.

### ii. *Level of Experience and Qualifications*

Plaintiff argues that discrimination and/or retaliation can be demonstrated by the fact that he had more experience than the selected applicants and was either equally qualified or more qualified than they were for the positions. [27] Courts, however, afford employers a great deal of discretion in assessing the credentials and qualifications of applicants and in determining the criteria for positions. *See Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 103 (stating that a court "must respect the employer's unfettered discretion to choose among qualified candidates" when a court is evaluating whether employer's purported reason was pretextual); *O'Leary v. New York State Unified Court System,* No. 05 Civ. 6722(HB) 2007 WL 2244483, at \* 7

(S.D.N.Y. Aug. 6, 2007) ("Defendant's decisions regarding the professional experience and characteristics sought in a candidate, as well as the search committee's evaluation of Plaintiff's qualifications, are entitled to deference."); *see also Ferguson v. Barram,* No. 98 Civ. 5368(THK), 2000 WL 375243, \*7 (S.D.N.Y. Apr. 11, 2000) (stating that, even though "different people might draw different conclusions about the relatively close merits of both candidates," when there is nothing in the record to suggest discrimination, the court should defer to the employer's business judgment).

27     Specifically, as detailed previously, Plaintiff claims that he was equally as qualified as Irene Corva, Joan Freeburn, and Dean Frenkian, and more qualified than Richard Dooley, Vera Bostick–Borden, Richard Anderson, Kathleen Skrupskis, Janet Mullarkey, Richard Heyniger, Norma Lefebvre, Raymond Egan, and Marie Martinez–Wolcott, for the positions for which they were selected.

In order to survive summary judgment, an employee asserting that his employer's proffered explanation is pretextual based on his purportedly stronger qualifications must demonstrate that his qualifications are "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the [employee] for the job in question." *Byrnie,* 243 F.3d at 103 (internal quotation marks omitted). A plaintiff's subjective claim that he was the most qualified candidate for a position is insufficient to establish pretext. *Holt,* 95 F.3d at 130; *see also Vara v. Mineta,* No. 01 Civ. 9311(RJH), 2004 WL 2002932, at \* 12 (S.D.N.Y. Sept. 7, 2004).

**\*33**  Here, as an initial matter, Plaintiff cannot survive summary judgment based on his assertions that, for certain positions, he was "equally" as qualified as the selected applicants, as he must be able to show that his qualifications were "superior," not merely equal. *See id.* Moreover, as to those positions for which he claims he was more qualified, Plaintiff has failed to present evidence capable of demonstrating that his qualifications were, in fact, "so superior" to those of the selected applicants that no reasonable person could have selected them.

Plaintiff has provided evidence of his long tenure at the SSA and of his supervisory experience at the Regional Office and specific Centers (primarily the Disability Center and the CSI), and notes that, in many instances, he had more years in each of those locations than particular applicants. Yet

the SSA has come forward with evidence, in the form of declarations made under penalty of perjury, that longevity alone was not the determinative factor in any of the selections at issue. Further, the applicants selected for the several positions in question each had lengthy and successful careers of their own at the SSA, as is amply documented by the record, including the applicants' applications and resumes. For example, it is undisputed that, prior to her selection for the position of Disability Center Director, Ms. Bostick–Borden had been employed at the SSA for 17 years as a claims representative, an operations supervisor, an analyst, an administrative assistant, and a project manager. (See Marinaro Decl., Ex. B (Application of Ms. Bostick–Borden); Milano Decl., at 11.) For another example, prior to his selection for District Manager in the Midtown Manhattan Field Office, Mr. Heyniger had served at the SSA for 29 years as a claims representative and a field representative, and had held numerous supervisory and managerial positions. (See Fulgieri Decl., Ex. A (Application of Mr. Heyniger); Milano Decl., at 22.) Similarly, prior to her selection for Director of the Program Operations Center, Ms. Mullarkey worked for the SSA for 36 years, 19 of which were in the Regional Office, in positions such as claims representative, field representative, operations supervisor, social insurance program specialist, branch manager, and Acting Director of the Program Operations Center. (See Snyder Decl., Ex. A (Application of Ms. Mullarkey); Milano Decl., at 25.) In light of this record, Plaintiff's recitation of his years of experience at the Regional Office or at specific Centers in particular fields, even coupled with his receipt of several awards and his experience as a union shop steward and president, is not sufficient to demonstrate that, as a general matter, his qualifications and credentials were "so superior" to the selected employees' qualifications and credentials that their selection was likely discriminatory or retaliatory. Byrnie, 243 F.3d at 103.

Plaintiff also makes more particular arguments regarding certain applicants' qualifications and the SSA's assessment of those qualifications. Specifically, Plaintiff challenges the qualifications of Mr. Dooley and Ms. Muir for the positions for which they were selected. With respect to Mr. Dooley's selection for DPA, Plaintiff contends that Mr. Dooley did not meet the required minimal qualifications stated in the Vacancy Announcement, in that he did not have specialized disability experience at the GS–13 level. (See Pl. Mem., at 19; Milano Decl., at 7.) As for Ms. Muir, Plaintiff contends that he "has raised doubt" about her experience and qualifications (Pl. Mem., at 16), specifically questioning whether she

actually served in one position she listed on her application (see Milano Decl., at 13–14).

*34 The SSA does not dispute Plaintiff's assertion that Mr. Dooley was supposed to have "specialized experience equivalent to the next lower grade," which, for the DPA position, would have been satisfied by specialized disability experience at the GS–13 level. (See Marinaro Decl., Ex. A, at US00048.) It is also undisputed that, at the time of his selection, Mr. Dooley had specialized disability experience only at the GS–11 level. (See Pl. Mem., at 19; Def. Reply Mem., at 6.) The SSA, however, has submitted evidence of its policy that employees who, like Mr. Dooley, gain experience in the "105 series up to the GS–12 level," and then accept a Regional Office position in an administrative specialty at the GS–13 level, are considered to meet the specialized experience requirements for higher-graded positions in the 105 series, including the position of DPA. (Supplemental Declaration of Kristin L. Vassallo, dated Mar. 12, 2008 ("Vassallo Supp. Deck") (Dkt.61), Ex. A (Qualifications Determinations for Jobs in the 105 series), at US00271; Ex. B (EEOC hearing testimony of Orentha Alava in SSA Case No. 99–0154), at p. US01305, ll. 3–25, p. US01306, ll. 2–4.) As Mr. Dooley fell within this policy, the SSA explains that he met the specialized experience requirement for the position at issue and was properly included on the Best Qualified List for that position. Further, Mr. Dooley had 17 years of employment with the SSA, and seven years at a GS–13 level position at the time of his selection, whereas Plaintiff had only six years at a GS–13 level position at the time of this selection. (See Milano Decl., at 8; Def. Reply Mem., at 6.)

Plaintiff's argument regarding Ms. Muir's supposed lack of qualifications is even weaker, as it is based wholly on speculation. First, he notes that, in her application for the Social Insurance Specialist position, Ms. Muir stated that the Adjudication Officer ("AO") Pilot involved six sites in the New York Region, and that she oversaw, inter alia, the establishment of new sites. (See Marinaro Decl., Ex. D (Application of Ms. Muir), at US00514–15.) Plaintiff maintains that, while he does not remember all six sites, he can show that the site in San Juan, Puerto Rico was already "up and running in 1996," prior to Ms. Muir's supposed service as Executive Assistant. (Milano Decl., at 14 (citing Infiesta Decl., Ex. G (Application of Ms. Martinez–Wolcott), at US02731).) From this, Plaintiff suggests that Ms. Muir's application was not fully credible, or that she "greatly embellished her list of accomplishments." (Id.) Plaintiff does not put forward any evidence, however, to show that Ms. Muir

was not, as she said, involved in overseeing the establishment of new sites.

More significantly, Plaintiff suggests that Ms. Muir never held the position of Executive Assistant to the Director of the New Jersey DDS, as listed in her application. (*See* Pl. Mem., at 16; Plaintiff's Response to Defendant's Memorandum of Law Dated March 12, 2008, dated Mar. 26, 2008 ("Pl. Reply Mem.") (Dkt.63), at 2.) Plaintiff points out that the SSA has not offered any evidence substantiating that she served in this position, which he claims would have been "a State and not federal position." (*See* Pl. Mem., at 16; Pl. Reply Mem., at 2.)[28] Plaintiff has offered nothing other than his own supposition, however, to support his assertion that Ms. Muir invented her federal service at the offices of the New Jersey DDS. Under the relevant federal regulations, the SSA may provide state DDSs with "[f]ederal personnel to perform onsite reviews, conduct training, or perform other functions needed to improve performance." 20 C.F.R. § 404.1662(c). Although Plaintiff argues that Ms. Muir never stated that she performed such "oversight activities as a federal employee" (Pl. Reply Mem., at 2), Ms. Muir in fact explained in her application that her "main function [as Executive Assistant] ... was to study and evaluate DDS performance and quality on an ongoing basis, providing federal direction, oversight and guidance on program management and policy matters." (Marinaro Decl., Ex. D, at US00515.) As this would be entirely consistent with the regulations, Plaintiff has given the Court no basis for concluding that Ms. Muir did not actually hold the prior job listed in her application.

28    Plaintiff also contends that, as Mr. Marinaro's declaration states that Ms. Muir served as Executive Assistant to the Director, he may have perjured himself, and that his credibility is a question for the jury. (*See* Pl. Mem., at 4–5; Pl. Reply Mem., at 2.)

**\*35** Thus, even Plaintiff's specific challenges to the qualifications of Mr. Dooley and Ms. Muir are insufficient to create a genuine dispute of fact as to the reasons for their selection. *See Byrnie,* 243 F.3d at 103 ("[The court's] role is to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business decisions.") (quoting *Simms v. Okla. Ex. Rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.1999) (internal quotation marks omitted)); *see also Scaria v. Rubin,* 117 F.3d 652, 655 (2d Cir.1997) (stating that it is not for the court to "sit as a super-personnel department that reexamines an entity's business decisions")

(quoting *Dale v. Chicago Tribune, Co.,* 797 F.2d 458, 464 (7th Cir.1986).

### iii. Selection Criteria

Plaintiff contends generally that the criteria used in the selection of some candidates is evidence of pretext. Specifically, Plaintiff argues that pretext may be demonstrated by comparing the selecting officials' purported reliance on some of the applicants' specialized experience or expertise, with the same officials' refusal to give weight to Plaintiff's own specialized experience. (*See, e.g.,* Pl. Mem., at 5 (arguing that selecting officials found his specialized experience to be "immaterial when it [came] to promotions in the Center for Disability").) Unless there is a showing of bad faith, however, it is not necessary for an employer to demonstrate the reasonableness of its employment criteria, *see Thornley v. Penton Pub., Inc.,* 104 F.3d 26, 29 (2d Cir.1997), nor is it for the Court to evaluate the wisdom of the criteria used in personnel decisions, *see O'Leary,* 2007 WL 2244483, at \*7 (finding that employer's decisions with respect to the professional experience sought and criteria used in selecting a candidate are entitled to deference). In this case, Plaintiff has not made a showing of bad faith regarding the SSA's reliance on the specialized experience of certain applicants.

As the SSA notes (*see* Def. Reply Mem., at 4), while Plaintiff may believe that his experience should have been valued more highly or weighed more heavily in the SSA's decision-making process, his personal view as to what criteria should have been used to evaluate applicants, or how that criteria should have been weighed, is insufficient to demonstrate that the SSA's proffered reasons for his non-selection are pretextual. *See O'Leary,* 2007 WL 2244483, at \*7 ("Whether an individual is qualified for a job must be assessed in relation to the criteria the employer has specified for the position, not criteria that seem reasonable to the litigant, or to this Court") (internal citations omitted).

Additionally, as evidence of pretext, Plaintiff asserts that the SSA "made selections based strictly on subjective criteria." (*See* Pl. Mem., at 18.) The law, however, is clear: employers are permitted to make personnel decisions based on subjective factors, as long as they are not "tainted, at least in part, by illegal discrimination." *See Nakis v. Potter,* 422 F.Supp.2d 398, 421 (S.D.N.Y.2006); *see also Byrnie,* 243 F.3d at 105 ("Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of ...

qualifications, no inference of discrimination can be drawn.") (internal quotations and citations omitted). As the SSA notes, it is not even required to submit documentation to substantiate its "subjective assessments." (Def. Reply Mem., at 5 n.3.) *See Bickerstaff v. Vasser College,* 196 F .3d 435, 446 (2d Cir.1999) (stating that an employer may satisfy its burden simply by offering a legitimate, non-discriminatory explanation for its action). Thus, the fact that selecting officials may have relied on "subjective" criteria and their personal assessment of applicants fails to create a triable issue of fact with respect to pretext.

*\*36* Plaintiff also contends that he has "refuted [Mr.] Marinaro's declaration" with respect to certain criteria that Mr. Marinaro supposedly considered in the selections of Ms. Skrupskis and Ms. Bostick–Borden. (*See* Pl. Mem., at 17.) More specifically, Plaintiff argues that Mr. Marinaro's credibility "should be decided by a jury" because he considered Ms. Skrupskis's effort in coordinating the Work Incentive Network as a factor in selecting her for a Project Manager position, but, as Plaintiff points out, employees other than Ms. Skrupskis participated in coordinating the Work Incentive Network. (*Id.;* Milano Decl., at 23.) Yet, as the SSA notes, Mr. Marinaro never suggested that Ms. Skrupskis was the only person responsible for the project. (*See* Marinaro Decl ., at ¶ 50.) In fact, Mr. Marinaro stated that he "placed significance on Ms. Skrupskis's Regional Commissioner's Citation *as a member of the team* that worked on this project." (*Id.*) (emphasis added.) Plaintiff further claims that he has "refuted" Mr. Marinaro's characterization of Ms. Bostick–Borden's interview performance as "outstanding," by contending that her "suggestions were old hat and had been used many times before." (Pl. Mem., at 16.) Yet, rather than creating a triable issue, Plaintiff's arguments regarding Mr. Marinaro's assessment of Ms. Skrupskis and Ms. Bostick–Borden appear to do nothing more than highlight Plaintiffs disagreements with Mr. Marinaro's subjective assessments. *See Byrnie,* 243 F.3d at 103 (stating that it is not the role of the court "to act as a superpersonnel department that second guesses employers' business judgments") (internal citations and quotation marks omitted).

Finally, Plaintiff argues that the SSA's reliance on criteria not listed in the posted Vacancy Announcements for the selections of Ms. Muir, Mr. Egan, and Ms. Martinez–Wolcott constitutes evidence of pretext. (*See* Pl. Mem., at 18.) In support of this argument, Plaintiff relies on *D'Cunha v. Genovese/Eckerd Corp.,* 479 F.3d 193 (2d Cir.2007) (cited

Pl. Reply Mem., at 1–2), where the employer stated that it relied upon the selected applicant's extensive managerial experience, yet such experience was not included in the job announcement for the particular entry-level position. *See D'Cunha,* 479 F.3d at 195. There, the court found that a genuine issue of material fact remained as to whether the reasons given for not hiring the plaintiff were a pretext for age discrimination. *Id.,* at 196. Significantly, though, Plaintiff fails to mention that, in *D'Cunha,* the plaintiff presented evidence establishing that other reasons put forth by the employer as to why plaintiff was not selected were in *fact false, id.* (emphasis added), making that case distinguishable from the instant case. Nothing in *D'Cunha* suggests that an employer's reliance on criteria not explicitly listed in a particular job posting can, by itself, provide evidence of pretext. *See also Ferguson v. Barram,* No. 98 Civ. 5368(THK), 2000 U.S. Dist. LEXIS 4592, at \* 19, n. 5 (S.D.N.Y. Apr. 11, 2000) ("[T]here is no basis to conclude that the fact that [budget experience] was not explicitly listed rendered [employer's] selection of [applicant other than plaintiff], in part based on this useful experience, in any way discriminatory.").

### iv. Pre–Selection of Applicants

*\*37* Plaintiff argues that the SSA "pre-selected" certain candidates, and that these "pre-selections" constitute evidence of pretext. In particular, Plaintiff contends that Ms. Muir, Mr. Anderson, and Ms. Skrupskis were each "pre-selected" for their positions. (*See* Pl. Mem., at 17, Pl. Decl., at 17, 22; Milano Dep., at p. 84, ll. 13–25, p. 163, ll. 9–25, p. 164, ll. 2–7.)

As an initial matter, Plaintiff has not come forward with any evidence in admissible form to support this contention. He bases his assertion regarding Ms. Muir on a "rumor" that the SSA created the position for which she was selected specifically for her, as she allegedly wrote the position description for this job. (*See* Milano Dep., at p. 163, ll. 9–25, p. 164, ll. 2–7.) His belief that the SSA "pre-selected" Mr. Anderson is similarly speculative; it is apparently based on the fact that, prior to being selected for the temporary Project Manager position, Mr. Anderson "met with [Disability] Center Director and others in closed door meetings." (Milano Decl., at 17.) The SSA correctly notes that Plaintiff's unsupported speculation is not admissible evidence sufficient to create a genuine issue of fact. (*See* Def. Mem., at 37); *see* Fed.R.Civ.P. 56(e); *see also Patterson v. County of Oneida,* 375 F.3d 206, 222 (2d Cir.2004) (finding "entirely

conclusory" allegations of discrimination insufficient to show existence of genuine issue of fact).

In any event, "even if the Court were to credit Plaintiff's allegation that [these applicants were] pre-selected, that fact does not give rise to an inference of discrimination without evidence that [the pre-selections] were somehow discriminatory." *During v. City University of New York,* No. 01 Civ. 9584(BSJ), 2005 WL 2276875, at * 7 (S.D.N.Y. Sept. 19, 2005).[29]

[29]    Indeed, without any showing of improper motive, a "pre-selection" could be construed to provide a non-discriminatory and non-retaliatory motive for the SSA's failure to select Plaintiff for a particular position—*i.e.,* that management had some other individual in mind when they created the position in question. *See Reeves,* 530 U.S. at 148 ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision.").

### v. *Supervisors' Recommendations*

Among the reasons given by selecting officials for selecting certain candidates, including Ms. Zanca, Ms. Bostick-Borden, and Mr. Anderson, is that these candidates were given strong recommendations by their supervisors. (*See, e.g.,* Marinaro Decl., at ¶¶ 13, 33, 55.) Plaintiff argues that, in the absence of written copies of these purported recommendations, any such recommendations would constitute inadmissible "hearsay"that cannot be considered by the Court. (*See* Pl. Mem., at 18; *see, e.g.,* Milano Decl., at 10, 17.) Plaintiff, however, apparently misunderstands the nature of hearsay evidence, and the standards that govern th SSA's motion.

"Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Here, the SSA has not referred to the supervisor recommendations for the purpose of demonstrating the truth of their contents. As set forth above, on its motion, the SSA only needs to articulate legitimate, non-discriminatory and non-retaliatory reasons for its selection decisions; one such reason it has proffered is that selecting officials were impressed with certain recommendations they had received. As the SSA has thus raised the supervisor recommendations only to explain the selecting officials' motivation or state of mind when

making their decisions (*see* Def. Reply Mem., at 9), the recommendations are not hearsay. *See Cameron v. Cmty. Aid for Retarded Children, Inc.,* 335 F.3d 60, 65 (2d Cir.2003) (noting that negative feedback from other employees about plaintiff was not hearsay, as the feedback established the decision-maker's state of mind, and that the inaccuracy of such feedback did not matter if the decision-maker believed it); *see also Zubrow v. Solvay Pharms.,* No. 03 Civ.1929(WWE), 2006 U.S. Dist. LEXIS 7039, at *19 (D.Conn. Feb. 3, 2006) (finding that the statements at issue did not constitute hearsay because they are not offered for their truth, "but are indicative of the motivation for the decision to terminate plaintiff's employment") (internal citation omitted); *McDermott v. Town of Windham Public Schools,* 225 F.Supp.2d 180, 183 (D.Conn.2002).[30]

[30]    Similarly, Plaintiff characterizes as "hearsay" any negative feedback that selecting officials may have received about him from others. (*See* Pl. Mem., at 9.) Plaintiff makes this specific assertion while challenging as unsubstantiated and "vague" Mr. Infiesta's expressed concerns regarding Plaintiff's lack of organization, his management ability, and his need for close supervision. (*Id.*) Plaintiff, however, does not point to any particular indication from Mr. Infiesta that he was basing his assessment of Plaintiff on feedback from others, aside from noting that Mr. Infiesta was never his first-line supervisor. (*Id.*) In fact, Mr. Infiesta states that, as Plaintiff's second-line supervisor, he was familiar with Plaintiff's performance. (*See* Infiesta Decl., at ¶ 37.) To the extent that Mr. Infiesta did rely on feedback from others regarding Plaintiff, this feedback would not constitute hearsay, for the same reasons discussed above. *See, e.g., Cameron,* 335 F.3d at 65. Furthermore, Plaintiff's disagreement with Mr. Infiesta regarding the quality of Plaintiff's work performance is insufficient to give rise to a triable issue of fact regarding pretext. *See Paddock v. SUNY Brockport,* 418 F.Supp.2d 288, 295 (W.D.N.Y.2006) (citing *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996)); *see also Viola v. Philips Medical Sys. of N. Am. v.,* 42 F.3d 712, 718 (2d Cir.1994) (noting that an employee's disagreement with an employer's negative assessment of his performance is insufficient to establish pretext).

### vi. *Evidence Not Produced in Discovery*

*38 Plaintiff contends that the fact that the SSA did not produce Ms. Zanca's application and the completed questionnaire from Ms. Bostick–Borden's interview is grounds for the Court to draw adverse inferences with respect to the SSA's purported reasons for selecting these candidates

instead of Plaintiff. (*See* Pl. Mem., at 3–4, 16, 18.) A party's failure to preserve evidence can support a jury charge permitting the jury to draw an inference that the evidence at issue would have been unfavorable. *See Residential Funding Corp. v. Degeorge Financial Corp.,* 306 F.3d 99, 107 (2d Cir.2002). The party seeking the adverse inference charge must, however, show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Id.* (quoting *Byrnie,* 243 F .3d at 107–12).

In this case, regardless of whether the documents in question would have been relevant to the issue of "pretext," Plaintiff has not demonstrated that the SSA was under an obligation at any time to preserve the documents at issue or that it actually destroyed the documents with a "culpable state of mind." Thus, Plaintiff has not shown that it would be appropriate for this Court to permit a jury to draw inferences against the SSA as a result of its failure to produce this evidence.

### vii. General Pattern of Selecting Candidates Other than Plaintiff

On his failure-to-promote claims, Plaintiff finally contends that, by failing to select him again and again, over an extended period of time, and by consistently selecting younger and less experienced individuals for the positions for which he had applied, the SSA engaged in a general pattern of conduct that, even standing alone, constitutes evidence of discrimination or retaliation.[31] (*See* Pl. Mem., at 1; *see, e.g.,* Milano Dep., at p. 150, ll. 20–25, p. 151, ll. 2–4, p. 156, ll. 9–13, p. 169, ll. 2–5, p. 172, ll. 22–25.) While there appears to be little Second Circuit case law addressing the issue of whether, if large enough, the sheer number of non-selections can rebut an employer's proffered non-discriminatory and non-retaliatory reasons for its actions, this Court has previously granted summary judgment for employers in cases where a plaintiff was bypassed for positions on a significant number of occasions. *See Ghosh v. New York City Dep't of Health,* 413 F.Supp.2d 322, 324, 334–38 (S.D.N.Y.2006) (granting summary judgment for the employer with respect to all but one of approximately 85 alleged discriminatory "non-selections," as plaintiff failed to provide evidence raising an inference of discrimination, although he was deemed qualified for each position); *see also Williams v. State of New York Office of Court Administration,* No. 80 Civ.

4717(CSH), 1987 U.S. Dist. LEXIS 315, at *24 (S.D.N.Y. Jan. 22, 1987) (granting summary judgment for employer where plaintiff claimed race discrimination based on 21 of 24 instances of not being selected for promotion). As one court has held, "[a]lthough several non-selections may be disheartening for plaintiff, the sheer number of non-selections alone is not sufficient to establish that defendant's proffered reasons were a pretext for discrimination." *Oliver–Simon v. Nicholson,* 384 F.Supp.2d 298, 314 (D.D.C.2005) (granting summary judgment in favor of employer where plaintiff alleged race, gender, and age discrimination for her denial of promotion on over 20 occasions; plaintiff's contentions that individuals selected were pre-selected, the selection process was irregular, and the employer's exhibited favoritism were held insufficient to rebut defendant's assertion that individuals selected were more qualified); *accord Hendricks v. Paulson,* 520 F.Supp.2d 65, 75–76 (D.D.C.2007) ("sheer number of positions for which [plaintiff] applied but was rejected" did not raise an issue of fact precluding summary judgment where plaintiff did not produce sufficient evidence to show that she was substantially more qualified than selected applicants).

31      The Court notes that, between 1982 and 1992, it appears that Plaintiff applied, but was not selected, for 20 to 25 positions both in the Regional Office and in Field Offices. (*See* Milano Dep., at p. 35, ll. 13–20.) Although not entirely clear from his deposition testimony, it further appears that Plaintiff, during that time, was seeking advancement from a GS–12 to a GS–13–level position, which he finally obtained in 1992. (*See* Background *supra,* at Point A.) Plaintiff was already over 40 years of age in 1982, but he apparently never raised charges of age discrimination (or any other type of discrimination) with respect to these earlier instances of his being denied a desired promotion. While perhaps of little relevance, this does at least suggest that Plaintiff is himself aware that repeated instances of non-selection may not, in itself, be tantamount to discriminatory conduct.

**\*39** As Plaintiff has failed to satisfy his burden of producing sufficient evidence to create an issue of fact as to pretext, I respectfully recommend that Plaintiff's failure-to-promote claims be dismissed.

### B. Claim Challenging the Extension of Robert Sayre's Temporary Detail

Plaintiff claims that Mr. Infiesta extended Mr. Sayre's 120–day detail as Acting CSI Director "solely to deprive [Plaintiff] of the opportunity to serve in a temporary higher graded

position in the Center ... and he did this in reprisal" for Plaintiff's EEO activity. (Pl. Mem., at 8.) Further, Plaintiff contends that the SSA violated its own internal promotion procedures (i.e., MOPP), by allowing Mr. Sayre to serve as Acting Director, a GS-14 position, for approximately 60 days beyond his 120–day temporary detail. (See id., at 7–8.) The SSA, however, asserts that Mr. Sayre was not assigned to a position at a higher grade for any period beyond the 120–day detail, as, when that detail ended, Mr. Sayre voluntarily agreed to continue in the position at his prior GS-13 pay level, until the new Director began. (See Def. Reply Mem., at 7.)

While Plaintiff argues that MOPP does not contain a provision allowing an employee "to volunteer to remain at a higher graded position without compensation" (Pl. Mem., at 8), he has failed to show that such voluntary service was expressly forbidden by MOPP. Moreover, even if the extension did violate MOPP, Plaintiff has presented no evidence to support his unsubstantiated speculation that Mr. Infiesta asked Mr. Sayre to continue as Acting Director "solely to deprive [Plaintiff] of the opportunity to serve in a temporary higher grade position." (Pl. Mem., at 8.) Mr. Infiesta states in his declaration that he asked Mr. Sayre to continue serving as Acting Director after his 120–day detail expired because, with the likelihood that a new Director would be ready to start in less than two months, it would not have made sense to name a new Acting Director. (See Infiesta Decl., at ¶ 24.) Aside from his conclusory allegations, Plaintiff has put forth no evidence to rebut the SSA's proffered reason for extending Mr. Sayre's detail, or to demonstrate that Mr. Infiesta made his decision based on Plaintiff's age or EEO activity. See Byrnie, 243 F.3d at 101 (stating that the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation" to preclude summary judgment) (internal quotation marks and citations omitted). Therefore, Plaintiff has failed to create a genuine dispute of fact as to the SSA's purported reason for Mr. Sayre's extension, and I respectfully recommend that Plaintiff's claim with repect to Mr. Sayre's extension be dismissed. [32]

[32]  Plaintiff also requests that the Court "draw an [a]dverse [i]nference that [Mr. Infiesta's extension of Mr. Sayre's service as Acting CSI Director beyond the 120–day detail] was made strictly to prevent [Plaintiff] from securing a temporary promotion as Center Director in reprisal for my EEO activities." (Pl. Mem., at 19.) Plaintiff offers no basis for this request, however, and his conclusory assertion as to the SSA's motive is

insufficient to satisfy the elements that a party must show to receive an adverse inference instruction.

## C. Claim Challenging Plaintiffs Reassignment from Team Leader to Program Expert

In a claim added to his complaint after it was filed in this Court, Plaintiff alleges that his August 2006 reassignment from Team Leader for the CSI to Program Expert was motivated by age discrimination and/or retaliation for his EEO activity. [33] This claim, too, cannot survive the SSA's motion.

[33]  Plaintiff also argues that the SSA removed him from his Team Leader position in violation of his Fifth Amendment right to due process because neither Ms. Carroll nor Mr. Infiesta informed Plaintiff in advance of the possibility that he would be reassigned. (See Pl Mem., at 10.) The Court has already ruled, however, that Plaintiff may not assert constitutional due process claims based on his reassignment because the Supreme Court has not found an implied Bivens remedy in the federal employment context. (See Memorandum and Order, dated Sept. 7, 2007 (Dkt.36), at 9, 11.) Moreover, the fact that Plaintiff was not informed that the SSA was dissatisfied with aspects of his performance and was considering his reassignment is irrelevant to whether Plaintiff is able to rebut the SSA's proffered reasons for reassignment. See Griffen v. Ambika Corp., 103 F.Supp.2d 297, 310–11 (S.D.N.Y.2000); see also Thermidor v. Beth Israel Med. Ctr., 683 F.Supp. 403, 413 (S.D.N.Y.1998) (citation omitted).

**\*40**  As an initial matter, although the parties do not address the point, it appears that Plaintiff has not satisfied the elements necessary to make out a prima facie case of retaliation with respect to this claim. In particular, based on the record, Plaintiff appears unable to satisfy the element requiring a causal connection between some form of protected activity and the adverse employment action, as Plaintiff has not presented any evidence to show such a connection. See Kessler, 461 F.3d at 205–06. From the record before this Court, it is not even clear when Plaintiff last engaged in protected activity, apart from the filing of his lawsuit in July 2005. Assuming that this was the activity that allegedly caused the SSA to reassign him, Plaintiff has not presented any direct or circumstantial evidence that would enable a reasonable fact finder to infer causation. The 13 months separating that protected activity in July 2005 from Plaintiff's reassignment in August 2006 is too long a period to allow Plaintiff to "benefit from the inference of discriminatory intent afforded in cases of temporal proximity." Moses v.

*The City of New York, et al.,* No. 06 Civ. 5974(JSR), 2007 U.S. Dist. LEXIS 64381, at * 9 (S.D.N.Y. Aug. 28, 2007) (finding 13 months separating the protected activity from the adverse action insufficient to make out a *prima facie* showing of a causal connection) (citations omitted); *see Clark County School Dist. v. Breeden,* 532 U.S. 268, 273 ("The cases that accept mere temporal proximity between an employer's knowledge of protect activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' "); *see also Woods v. Enlarged City School Dist. of Newburgh,* 473 F.Supp.2d 498, 528–29 (S.D.N.Y.2007) (collecting cases and finding a five-month separation between the protected activity and adverse action precludes a finding of causal connection based on temporal proximity). Accordingly, although the SSA does not rely on this point, it appears that Plaintiff's reassignment claim is subject to dismissal for failure to make out a *prima facie* case, to the extent the claim is presented as a retaliation claim.

In any event, even assuming Plaintiff has made a *prima facie* showing of retaliation, he still fails to demonstrate the existence of a triable issue of fact as to whether the reasons given by the SSA for his reassignment are a pretext for retaliation or discrimination. The SSA has met its burden of articulating legitimate, non-discriminatory and non-retaliatory reasons for Plaintiff's reassignment. *See Bickerstaff,* 196 F.3d at 446 (stating that defendant's burden of production is "not a demanding one," as she need only offer a non-discriminatory explanation to rebut plaintiff's *prima facie* case ). Ms. Carroll, Plaintiff's supervisor at the relevant time, states that, after she conferred with her own supervisor, Mr. Infiesta, she decided to reassign Plaintiff "because he was not demonstrating the high degree of organization, initiative, and assignment-control that is required of a Team Leader" and because "[she] saw little to no improvement" in these areas during her time as Plaintiff's supervisor. (Carroll Decl., at ¶¶ 6–7.) More specifically, Ms. Carroll states that she received many inquiries from other SSA executives about matters assigned to Plaintiff or his team, and that she repeatedly had to ask Plaintiff for updates, which he was unable to provide at the time of her requests. (*See* Carroll Decl., at ¶ 6.) Further, Ms. Carroll states that, when Plaintiff did provide her with updates, she would often discover that Plaintiff had never assigned the matters or, if they had been assigned, Plaintiff had "not established control[s]" to ensure timely completion. (*Id.*) Additionally, Ms. Carroll maintains that she spoke with Plaintiff about his lack of organization and control

over workloads, as well as about the messiness of his desk. (*Id.,* at ¶ 7–8.)

**\*41** In attempting to rebut Ms. Carroll's proffered reasons, Plaintiff puts forth several arguments. While Plaintiff does not contest that Ms. Carroll spoke with him many times about his desk, he disagrees with her critical assessment of the situation and that the desk was a "significant issue" affecting his job performance. (*See* Pl. Reply Mem., at 3.) He also disputes Ms. Carroll's assessment of his performance in general and his supposed inability to provide sufficient updates, arguing that Ms. Carroll "micromanaged." (*Id.;* Pl. Mem., at 10–11.) Yet merely disagreeing with his supervisor's assessment of his work performance is insufficient to raise a triable issue of fact regarding pretext. *See Griffin,* 103 F.Supp.2d at 309 (stating that merely because an employee disagrees with her employer's assessment of her performance is not sufficient, by itself, to show that employer's proffered reason for an adverse action was pretextual); *Ricks v. Conde Nast Pubis., Inc .,* 92 F.Supp.2d 338, 347 (S.D.N.Y.2000) (same).

Plaintiff's further argument, that, under two prior Directors, he had experienced "no problems" serving as a Team Leader and had, in fact, received performance awards (Pl. Reply Mem., at 3; Pl. Mem., at 10–11), is also insufficient to raise a genuine issue of disputed fact with respect to pretext. *See Pergament v. Federal Exp. Corp.,* No. 2:03–cv–01106 (ENV) (AKT), 2007 WL 1016993 (E.D.N.Y. Mar. 30, 2007) (noting that "it is well-established that a [p]laintiff's subjective opinion about her own performance is insufficient to give rise to a triable issue of fact regarding pretext," and the fact that plaintiff received positive feedback from a prior supervisor does not change that result) (internal quotation marks and citations omitted); *Orisek,* 938 F.Supp. at 191 ("a new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations") (internal citations omitted); *see also Brower v. Continental Airlines, Inc.,* 62 F.Supp.2d 896, 906 (E.D.N.Y.1999) (finding that prior positive assessments of employee's performance "will not establish that a later unsatisfactory evaluation was a pretext for unlawful discrimination"). [34]

---

34    Plaintiff relies on *Tomassi v. Insignia Fin. Group, Inc.,* 478 F.3d 111 (2d Cir.2007) to support his argument that his prior receipt of awards and lack of negative feedback from prior supervisors refute Ms. Carroll's assessment of the caliber of his work. (*See* Pl. Reply Mem., at 3.) In that

case, the court vacated a grant of summary judgment for the employer, finding that the employee had presented evidence from which a jury could reasonably find that her supervisor was motivated by age discrimination in terminating her. *Tomassi,* 478 F.3d at 116–17. Plaintiff is correct that the court noted that the employee's supervisor had affirmed the quality of the employee's job performance, as was evidenced by her promotion, raises, and compliments she received throughout her employment. *Id.,* at 116. The employee in *Tomassi,* however, produced significant evidence indicating that age discrimination was a motivating factor, as her supervisor made frequent age-related remarks to her throughout her employment and also made age-related comments while terminating the employee. *Id.,* at 112, 116. Plaintiff has presented no similar evidence of age-related comments here.

Finally, Plaintiff seeks to undermine the criticisms of his job performance advanced by both Ms. Carroll and Mr. Infiesta, by challenging their own conduct and motives, as well as Ms. Carroll's credibility. Plaintiff contends, for example, that, if Ms. Carroll is correct that his team's performance decreased, it was only because his team had lost several experienced members, and his requests for additional overtime for himself and his team were always denied by Ms. Carroll and Mr. Infiesta. (*See* Milano Decl ., at 2–3; Milano Dep., at p. 395, ll. 2–24.) Plaintiff states that he was replaced as Team Leader by a personal friend of Mr. Infiesta, and speculates that Mr. Infiesta's desire to replace Plaintiff with this friend was a motivating factor in Plaintiff's reassignment. (*See* Pl. Mem., at 10, 20.) Plaintiff also states that Ms. Carroll criticized him, after an August 3, 2006 meeting, for violating the Regional Office's dress code, but did not similarly criticize others (*see* Milano Dep., at p. 399, ll. 12–21, p. 401, ll. 12–25, p. 402, ll. 2–15), arguing that this demonstrates that he was "targeted" and that Ms. Carroll was putting pressure on him to try to get him to retire (*see id.,* at p. 402, ll. 14–15, p. 403, ll. 2–11). As for his challenge to Ms. Caroll's credibility, Plaintiff points out that she indicated, on the form used for his October 4, 2006 review, that his performance was at a "Successful Level," as opposed to an "Unacceptable Level," which Plaintiff argues is at odds with her current statements. (*See* Pl. Mem., at 11, Ex. Q.)

*\*42* None of these additional arguments are sufficient for Plaintiff to overcome the SSA's motion. Plaintiff's assertions as to his supervisors' motives are conclusory and speculative, and, as such, they do not raise triable issues. *See Byrnie,* 243 F.3d at 101 (stating that the non-moving party may not rely on "conclusory allegations or unsubstantiated speculation" to

preclude summary judgment) (internal quotation marks and citations omitted); *see also Agonafer v. Rubin,* F.Supp.2d 300, 304 (S.D.N.Y.1998) (holding that an employer may decline to promote for any reason that is not discriminatory) (internal quotation marks and citation omitted). The conclusion Plaintiff seeks to draw from Ms. Carroll's written evaluation of his performance—that she is currently being untruthful about his work performance—also lacks support, as, on the evaluation form Plaintiff cites, there was no option for rating an employee at a level other than "successful" or "unacceptable," and Ms. Carroll has not asserted that Plaintiff's performance was unacceptable, only that he had not demonstrated desired improvement in certain areas. (*See* Carroll Decl., at ¶ 7.) And even assuming that this evidence were capable of showing that Ms. Carroll's proffered reasons for Plaintiff's reassignment are false, Plaintiff has not submitted any evidence in admissible form, as opposed to conclusory allegations, showing that the SSA's "real reason" for his reassignment was discrimination or retaliation. *See St. Mary's Honor Ctr.,* 509 U.S. at 515; *see also McWhite v. New York City Housing Authority,* No. 05 CV 0991(NG) (LB), 2008 U.S. Dist. LEXIS 29145, at *29 (E.D.N.Y. Apr. 10, 2008) (granting summary judgment for employer where plaintiff did not produce sufficient evidence to show discriminatory intent because, even if plaintiff s evidence showed that employer's proffered reasons for denying her the promotion were false, plaintiff submitted no evidence to show that the real reason for denying her the promotion was discriminatory).

As Plaintiff has not presented sufficient evidence to demonstrate that the SSA's proffered reasons for his reassignment are pretextual and that discrimination or retaliation was the "real reason" for his reassignment, I respectfully recommend that summary judgment be granted as to Plaintiff's claim challenging his reassignment.

### D. *Plaintiff's Privacy Act Claim*

Plaintiff claims that the SSA violated his rights under the Privacy Act when Ms. Carroll and Mr. Infiesta, Plaintiff's first and second line supervisors respectively, allegedly informed Mr. Sayre of Plaintiff s reassignment from his position as Team Leader one day before Plaintiff was informed of the reassignment. (*See* Pl. Mem ., at 20; Am. Compl., at No. 25.) To state a claim under the Privacy Act, "a plaintiff must show that: (1) the information at issue is a record contained within a system of records; (2) the agency violated the Act with respect to that record; (3) the disclosure had an adverse effect on the plaintiff; and (4) the violation was willful or intentional." *Int'l*

Union, Security, Police, and Fire Professionals of America v. United States Marshal's Serv., 350 F.Supp.2d 522, 528 (S.D.N.Y.2004) (citations omitted). The burden of proof with regard to each element rests with the plaintiff. See Germosen v. Cox, No 98 Civ. 1294(BSJ), 1999 U.S. Dist. LEXIS 17400, at * 56 (S.D.N.Y. Nov. 9, 1999).

**\*43** In this case, Plaintiff claims that his supervisors should not have informed another employee of Plaintiff s reassignment, prior to informing Plaintiff himself, but, as the SSA notes, Plaintiff does not make any allegation that the information that was disclosed was a "record contained within a system of records" or that any disclosure of information had "an adverse effect" on him, financially or otherwise. See Rooney v. Wittich, 21 F.Supp.2d 273, 281 (dismissing claim under the Privacy Act where "plaintiff has not identified what records were allegedly disclosed, what 'system of records' these documents were contained in, to whom the records were disclosed, or the adverse effect of this alleged disclosure"). As Plaintiff has failed to present evidence capable of satisfying the elements of a Privacy Act violation, I respectfully recommend that his Privacy Act claim be dismissed.

### E. Claims Under 5 U.S.C. §§ 2301 and 2302

For his last claim, Plaintiff alleges that the SSA's promotion plan, MOPP, violates the merit principles of the Civil Service Reform Act of 1978 ("CSRA") (codified, as amended, in various sections of Title 5, United States Code), specifically 5 U.S.C. §§ 2301(b) and 2302(b). (See Pl. Mem., at 20.) The CSRA creates a framework for "evaluating adverse personnel actions against [federal employees]," Dotson v. Griesa, 398 F.3d 156, 163 (2d Cir.2005) (quoting Lindahl v. Office of Pers. Mgmt., 470 U.S. 768, 773–74 (1985)). As part of that framework, the CSRA "deprives federal employees of any federal judicial remedies that [are] not expressly provided by the CSRA's statutory scheme." Joseph v. Leavitt, 386 F.Supp.2d 487, 488 (S.D.N.Y.2005); see also Jarvis v. Cardillo, No. 98 Civ. 5793(RWS), 1999 U.S. Dist. LEXIS 4310, at * 8 (S.D.N.Y. Apr. 6, 1999) ("A plaintiff complaining of actions concerning matters relating to [his] employment that occurred during the course of employment is restricted to the remedies provided by the CSRA.").

Chapter 23 of the CFRA establishes a system of merit principles by which federal employees are promoted, see 5 U.S.C. § 2301(b), and it also sets out "prohibited personnel practices," which consists of various actions that agencies are forbidden from undertaking, as they would violate the "merit system principles," see 5 U.S.C. § 2302(b)(12); Fausto,

484 U.S. at 446. Courts have held, however, that §§ 2301 and 2302 do not create a private right of action in federal court. See Hechman v. Olive, No. CV 88–2981(RJD), 1992 U.S. Dist. LEXIS 19090, at * 13 n. 5; see also Phillips v. General Services Admin., 917 F.2d 1297, 1298 (D.C Cir.1990). Instead, the CSRA provides for an administrative remedy, where an employee complaining of matters relating to his employment may file a complaint with the Office of Special Counsel, which is empowered to investigate the allegation; may request that the agency take corrective action; and, if no corrective action is taken, may petition the Merit Systems Protection Board. See Dotson, 398 F.3d at 164, n. 3; Joseph, 386 F.Supp.2d 487, 493–94; see also Tiltti v. Weise, 155 F.3d 596, 601 (2d Cir.1998).

**\*44** As the CSRA does not provide Plaintiff with a federal judicial remedy for his claim regarding the SSA's violation of the "merit principles," I respectfully recommend that Plaintiff's final claim be dismissed.

### CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the SSA's motion for summary judgment be granted in its entirety, and that Plaintiff's cross-motion for summary judgment be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, United States Courthouse, 500 Pearl Street, Room 1610, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Chief Judge Wood. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. See Thomas v. Arn, 474 U.S. 140, 155 (1985); IUE AFL–CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir.1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 58 (2d Cir.1988); McCarthy v. Manson, 714 F.2d 234, 237–38 (2d Cir.1983).

Milano v. Astrue, Not Reported in F.Supp.2d (2008)

End of Document

© 2013 Thomson Reuters. No claim to original U.S. Government Works.